TOBIAS WYNKOOP, Plaintiff in Error, *v.* CALEB COWING *et al.*, Defendants in Error.

### ERROR TO LAKE.

The rule in equity being, once a mortgage always a mortgage, the true character of every conveyance of land is open to investigation.

Full proof is required to countervail two sworn answers in equity.

Technical words used in letters, by unprofessional persons, should not be so construed as to violate the purport and meaning of the missives, in which they are used. Nor can sworn answers to a bill in chancery be overcome, by resort to such technical phrases or words.

Although parties may not, at the same time by the same instrument, stipulate for converting a loan and mortgage into an absolute purchase upon the happening of a subsequent event, yet it is true that a subsequent *bona fide* agreement for the extinguishment or purchase of an equity of redemption for a valuable consideration, will be sustained.

Parties are estopped by the recitals in an agreement, and are bound by their admissions in it.

Wynkoop *v.* Cowing et al.

Where parties make time one of the conditions of a contract, courts of equity will not relieve a defaulting party, where there is no waiver by the other party.

A condition in a deed may be annexed to every species of estate and interest in real property.

A count of money tendered may not be necessary, when the party to whom it is offered absolutely refuses to receive it. But this may not dispense with the existing ability to make the payment, by actually having the money present, or within convenient reach, so that it may be counted and delivered.

THIS suit was commenced by the complainant against the defendants, in the Circuit Court of Lake county, by bill in chancery, setting forth that Tobias Wynkoop, about the first day of June, 1835, entered upon and took possession, by right of preemption, of certain lands, lying and being in township No. 44 N., R. 11 E. of 3rd P. M., and describing them, in all 1,520 and $\frac{18}{100}$ acres, and that Wynkoop continued to reside upon, occupy and improve said lands from June, 1835, to about the first day of May, 1850. That Wynkoop, during the years 1835, '36 and '37, enclosed all of said land by fence. That said lands at the time Wynkoop took possession of the same, belonged to the United States Government, and so continued until about June 11th, 1842, at which time they were offered for sale by said government. That Wynkoop was desirous of purchasing said lands at said sale, and not being in possession of money sufficient to enable him so to do, entered into arrangements with Caleb Cowing, of the county of Yates, and Abraham A. Post, of the county of Ontario, in the State of New York, for a loan from Cowing and Post of the money necessary for the purchase of said lands from the United States. That Wynkoop was induced to call on Cowing for the loan of this money, from the fact that Cowing had on several occasions during the years 1840, '41 and '42, written to Wynkoop that he, Cowing, would assist Wynkoop in the purchase of said lands, that he, Cowing, had the money and would loan it to Wynkoop, and charge him seven per cent. interest per annum. That Wynkoop went to the State of New York in May, 1842, and induced Cowing and Post to come to Illinois and loan him the money. That about June 1st, 1842, Cowing and Post came to Chicago, where the land sale was to take place. That Cowing then and there agreed with Wynkoop that he would loan to Wynkoop the sum of $1,200, which was to be paid to the United States, as the consideration for the purchase of 960 acres, being part of lands first described. That June 11th, 1842, Cowing loaned and advanced to Wynkoop $1,200. That Wynkoop, for his own use and benefit, then purchased the lands last above described, and took the certificates of purchase therefor in the name of Cowing, to secure him for said loan, and to secure him for his expenses in coming to Illinois on the business

of Wynkoop, and to secure him for $30 which Cowing then loaned Wynkoop, besides the amount to purchase said land. That Cowing, at the time of the loan aforesaid, agreed with Wynkoop, in consideration of the conveyance aforesaid, that he would, immediately upon receiving the certificates of purchase, make, execute and deliver to Wynkoop, a bond in writing, conditioned that if Wynkoop, his heirs or assigns, at any time within four years from June 11th, 1842, should pay or cause to be paid to Cowing, his heirs or assigns, $1,630 and interest at seven per cent. per annum, to be paid semi-annually, then he, Cowing, should convey to Wynkoop, his heirs or assigns, by deed in fee simple, the tracts of land last above described. That in accordance with said agreement, a bond was drawn up and ready to be signed by Cowing, and presented to him to sign by Wynkoop. That about June 11th, 1842, Wynkoop met Cowing on a steamboat, in the Chicago river, at a time when Cowing was leaving for the State of New York, and then asked Cowing if said bond was signed, and if he would deliver it to him, Wynkoop, to which Cowing replied, that he was in a hurry then, but would make it all right with Wynkoop, and that Cowing then handed to Wynkoop a piece of paper containing a memorandum, stating the amount of the loan to Wynkoop, which amount was about $1,630; $1,200 of the same being for money loaned as aforesaid, $400 being for the expenses incurred by Cowing in coming to Illinois at the request and on the business of Wynkoop as aforesaid, and $30 for money loaned to Wynkoop by Cowing to pay for cattle. That Cowing immediately after delivering said memorandum to Wynkoop, left for the State of New York, and ever after neglected and refused to deliver said bond to Wynkoop.

That said land, June 11th, 1842, was worth in cash $8 per acre, and that Wynkoop had been offered prior thereto, for his interest and claim, $3,000.

That Wynkoop on the 11th June, 1842, at Chicago, entered into an agreement with Abraham A. Post, by the terms of which said Post was to loan to Wynkoop $700 to enable him to purchase certain described lands, in all five hundred and sixty acres, and being parcel of the land first described; and that the deeds of said last above described lands were to be taken to Post to secure him for the loan of said money, and to secure him for the amount of his expenses incurred in traveling to and from the State of New York on the business of Wynkoop; and also for money loaned to Wynkoop at the same time; and according to said agreement, Wynkoop borrowed of Post, June 11th, 1842, at Chicago, $1,287, and Post took a title to said lands last mentioned, in his name, but for the use and benefit of Wyn-

koop, and as security for said loan, being the amount last mentioned. Post at the same time executed and delivered to Wynkoop a bond conditional, that if Wynkoop at any time within four years from June 11th, 1842, paid or caused to be paid to Post, said $1,287, with interest at seven per cent. per annum, payable semi-annually, then Post, his heirs, admininistrators or assigns, would convey said lands last mentioned to Wynkoop by warranty deed in fee. That said land is now in Cowing's possession. That the cash value of lands conveyed to Post at the time of conveyance to him, was $8 per acre. That on the 11th March, 1848, Post conveyed by quit claim deed to Cowing, all his right and interest to said lands for the consideration of $1,751.20. That at the time that Cowing purchased of Post he well knew of Wynkoop's rights in the lands, and that the title that passed from Post to Cowing was only a lien or security on said lands for the payment of said loan to Post by Wynkoop, and it was at the time of said sale expressly agreed between Post and Cowing that Wynkoop's rights in the premises should not be affected by said sale, and that Wynkoop should have further time, until January 1st, 1849, to pay the amount due Post on the bond, and if he should pay the same on or before that time, then Cowing should make and deliver to Wynkoop a warranty deed of said lands so purchased by Cowing of Post, according to said bond from Post to Wynkoop.

That January 3rd, 1849, Wynkoop entered into an agreement with Cowing, which said agreement was reduced to writing, and signed by Cowing and Wynkoop, and is to the effect and purport as follows :

THIS AGREEMENT, Made this third day of January, 1849, between Caleb Cowing, of Yates county, in the State of New York, of the one part, and Tobias Wynkoop, of Lake county, in the State of Illinois, of the other part, witnesseth : That said Cowing is the owner of one thousand five hundred and twenty-seven acres of land, in township number forty-four North, of Range eleven East, in Lake county, in the State of Illinois, now in possession of said Wynkoop, under a forfeited contract for the purchase of the same. 2nd. The said Wynkoop hereby surrenders to the said Cowing the actual possession of the said lands and of every part thereof, and acknowledges himself to occupy the same as tenant at will of the said Cowing, and liable to be removed from the occupancy at the will of said Cowing. 3rd. It is agreed by and between the said Cowing and Wynkoop, that he, the said Wynkoop, may sell and dispose of so much of the said lands as will amount to the sum of five thousand six hundred dollars, with interest and other charges as hereinafter expressed, and that upon receiving the money or securities arising from such sales, he, the said Cowing, will convey the lands so sold to the purchasers thereof by a good and sufficient deed, executed by himself and wife; such sales may be made for cash, or part cash and part credit, according to the

custom of the country, and the whole purchase money on such sales to be paid to the said Cowing, and the securities, whether by contract or bond and mortgage, are to be received by him before the execution of a conveyance of the land or any part of it. 4th. When so much of the lands shall have been sold as that the money and securities received therefor shall amount to the said sum of five thousand six hundred dollars, with interest thereon to be paid half yearly, on the first days of June and December of each year, at and after the rate of seven per cent. per annum, until the whole principal shall be paid, together with taxes, the said Cowing may hereafter pay on the said lands, and the expenses of the said Cowing in going to, remaining at, and returning from the State of Illinois to attend to the business of the said lands, with a compensation of one dollar and fifty cents per each day devoted to the said business, and in traveling to and from, and staying in Illinois on such business; and all the expenses of counsel, and of drawing and recording papers; then and in that case the said Cowing hereby agrees and covenants to and with the said Wynkoop that he will retain and hold such portions of the said lands as may remain unsold, for the benefit of the said Wynkoop or his family. 5th. In case the said Wynkoop shall not, by the first day of June next, sell enough of the said lands to pay off the several sums above mentioned, then the said Cowing reserves the right to sell and dispose of one-third part of the said land, during the year one thousand eight hundred and forty-nine, and apply the proceeds as herein provided for sales by the said Wynkoop; and also, during the year one thousand eight hundred and fifty, the said Cowing has the right to sell the residue of the said lands, or so much thereof as shall be sufficient to pay off the balance that may remain, after applying the proceeds of the sale that may have been made in the year one thousand eight hundred and forty-nine, such right, however, not to be exercised by the said Cowing in either year provided the said Wynkoop shall proceed with reasonable diligence in the sale of said lands.

Witness our hands and seals, the day and year above written.

CALEB COWING. [SEAL.]

In presence of B. WHITING.      TOBIAS WYNKOOP. [SEAL.]

That the lands mentioned in the above agreement are the same that were purchased by Wynkoop, June 11th, 1842, as before stated, and the same conveyed to Cowing and Post as security for the loans aforesaid. That the $5,600, was the amount claimed to be due by Cowing from Wynkoop on account of the loan to him by Cowing, June 11th, 1842, with interest and the taxes paid by Cowing, and on account of said loan from Post to Wynkoop, including interest on the same and taxes, and the expenses of Post, and also the sum of $50 loaned by Cowing to Wynkoop, January 3rd, 1849. That immediately after the making of said agreement, and during 1849 and the first of 1850, Wynkoop endeavored to sell said lands in said agreement, and used all the means in his power so to do, but owing to the scarcity of money in Illinois, was unable to sell the same or any part thereof for any adequate consideration. That on the 15th of January, 1850, Cowing advertised in a public newspaper published in Yates county, New York, and also in one published in the city of Chicago, all of said lands for

sale, to be sold at public sale at the Geneva Hotel, in the town of Geneva, in Ontario county, New York, May 7th, 1850. That March 22nd, 1850, Cowing sold and conveyed to Julius Bull, of Seneca county, New York, all of said lands above described, for the alleged consideration of $6,000, and at the same time made, executed and delivered to Bull, a warranty deed (subject to all back taxes), of said lands. That at the time of said sale from Cowing to Bull, the cash value of said lands was $10 per acre, and that at the time of said sale from Cowing to Bull, the said agreement last above mentioned between Cowing and Wynkoop was in full force, and Bull well knew at the time of said conveyance to him, that said agreement had been made between Cowing and Wynkoop, and that it remained in the possession of Wynkoop unforfeited, and uncancelled. That about October 15th, 1850, Wynkoop called upon Bull, and informed him that he had come to fulfill the terms of the agreement above mentioned between Cowing and Wynkoop, and also told him, that he, Wynkoop, had the money, and was prepared, willing and desirous to pay him, Bull, the amount of money mentioned in said agreement, together with all interest, taxes and expenses that might be due thereon, and offered said Bull said amount, and demanded of him a deed of said premises in accordance with the terms of said agreement, and that said Bull replied that he would have nothing to do with Wynkoop. That June 3rd, 1851, Wynkoop tendered to Bull $7,000, and demanded of him a deed of said lands according to the terms of said agreement, and that Bull replied that he knew nothing about the matter, and referred Wynkoop to Cowing. That June 14th, 1851, Wynkoop tendered to Cowing $7,000 on said agreement, and demanded of him a deed in accordance with the terms of the agreement of January 3rd, 1849; that Cowing then told Wynkoop that he must go to see Bull, that he, Cowing, had nothing to do with the matter, that Bull knew all about the agreement and would do what was right. That $7,000 was the full amount due on said agreement between Cowing and Wynkoop. That Wynkoop has always since January 3rd, 1849, been ready and willing to perform on his part all of the terms of said agreement, and to pay to Cowing or to Bull the full sum that may be due on said contract. That Julius Bull commenced an action of forcible entry and detainer before a justice of Lake county, against Wynkoop, to recover possession of said premises, at which time Wynkoop was absent from Illinois, and his wife, for the fear of said action, and being driven from said premises by force, yielded and left the possession thereof, since which time Bull has remained in the possession thereof. That Wynkoop has repeatedly applied to Cowing and Bull, and requested

them specifically to perform said agreement, and that they abso-
lutely refuse so to do.   That Cowing and Bull are combining
and confederating together to wrong Wynkoop in the premises.
That the conveyance taken by Cowing, June 11th, 1842, was
intended by Cowing and Wynkoop only as a lien upon said
lands, and as security for said loan by Cowing to Wynkoop.
That Cowing at the time that he purchased said lands of Post
well knew, or had been informed, that the title to said lands so
purchased by Cowing, was held by Post as security to him from
Wynkoop for said loan from Post to Wynkoop.   That the agree-
ment of January 3rd, 1849, was only intended by Cowing and
Wynkoop as a substitute for the former contract hereinbefore
mentioned, between Cowing and Post and Wynkoop, and
intended only to secure the payment of said loan with interest,
expenses and taxes to Cowing.   That· Bull well knew at the
time that he purchased of Cowing the interest of Wynkoop in
the premises, and at the time of the conveyance from Cowing
to Bull, or at the time of the payment of the purchase money
for said lands, if any purchase money was paid by Bull, he well
knew or had been informed, or received some intimation that
Cowing had entered into said agreement with Wynkoop, and
that Cowing held the title to said lands only as security for the
loan of the moneys aforesaid to Wynkoop.   The answer of
defendants is required to be under oath, and they are interro-
gated specially and fully in relation to every material matter
charged in the bill.   The bill prays that the said agreement
made between Wynkoop and Cowing of January 3rd, 1849, may
be specifically performed, and that Bull surrender to Wynkoop
said lands, Wynkoop being willing and ready, and offering spe-
cifically to perform said agreement in all things on his part, and
for such other relief as may be necessary, etc.

Cowing and Bull asked and obtained leave to file their sepa-
rate answers, and filed the same under oath, denying the charges
in the bill.

At September term, 1857, of the Lake Circuit Court,
Manniere, Judge, presiding, the bill was dismissed, and judg-
ment for costs against Wynkoop, and in favor of defendants, and
Wynkoop prayed an appeal to the Supreme Court, which was
granted.

Letters referred to in the opinion of the court:

April 14th, 1847.

Mr. Tobias Wynkoop—*Dear Sir :*—I have waited a long time to hear from
you but no letter has come so I will write again, Chambers stated you had cut and
sold timber for mostly two meeting houses (that is the long timber) off of mine
and you out to have stated to me if it was not true, but at any rate dont cut and
sell timber I had thought of coming out this Spring but I think it uncertain

whether I can before fall, therefore go on sow and plant and raise all you can so that you may be able to pay the taxes for it comes into taxin this season, and next fall it will have to be paid, there has been several wanting to bye, but if you act the fair man (I shall not sell till I see you) pay the Taxes and not cut the timber and sell it which I hope is not so for chambers has told me something else which provves not to be true at that time I believed it I wrote to you, and your not answering it looked as if it was so) let that be as it may) when I do come I can see for myself try to make arrangements to raise the money if you mean to ever redeem against I come, for I am getting old and want all things settled I was laid up all last season, but am better now I have given up bying any more in that country for tis costly running one way and the other and no great comfort in it neither I have not seen Post I think in six months and have heard nothing from him when he is coming out) I believe all you relations are well I wish you to write to me soon, Direct to Bigstream Point Yates County I think you can make more money raising flax seed than any thing else half a bushel of seed is anough to sow an acre and you will raise from 10 to 15 bushels which always fetches a dollar here and must be worth 6 shillings there and then it is ready for wheat or you can sow it every year on the same ground.                    Yours Respectfully,

CALEB COWING.

May 1st, 1848.

Mr. Tobias Wynkoop—I received a letter from you Stating the tax was Illegally assessed and you would not pay it I should like to hear how the matter went in your other letter you stated you would be here the first opening of Navigation and pay Post and me off, if they git Judgment the tax must be paid by somebody and I am so situated now that I have to see something to it or about it Post was determined to sell his and Lawyer Wood of Geneva offered to pay him the cash down for it but he said he had rather I would have it than him so I bought it the 11th of March 1848 and paid him $1250,00 down and Secured the rest and you have till the second day of January next to redeem in now I want you to do it if you can and if you can not I calculate to act the fair man that is if you do so, if you pay the taxes or git rid of them so that they dont touch the land or sell it for taxes nor waste nor sell timber I calculate to do what is Just and right between man man and as you told me I mean to give you a good fat slice there will be I suppose a great many medling with that that is none of their business telling lies both sides as I was told you was selling timber &c but keep cool write to me Just as you feel, I have never been in your way nor interfered in your business, I have not been there in most 5 years next Octr) so I am sure you cant fond fault with me and my buying out Post dont hinder your paying for if it is sold for taxes I can redeem in two years by paying double and interest but of course you will see to that as it is for your benefit to have the taxes paid, we are all well I was at Seneca Saturday 29th Posts folks and Fiero's are well Post feels very lonely he lost his wife my best respects to you and wife and family and all friends there.

CALEB COWING.

The season is very cold and dry
neither grass nor pasture yet
Wheat has dried up a good deel but looks better than last year, write soon act friendly, I am direct to Big Stream Point Seneca Lake how much is my land worth on Fort Hill near Morses I have 120 acres there please state to me

CALEB COWING.

Wynkoop *v.* Cowing et al.

JULY 21, 1848.

MR. TOBIAS WYNKOOP—*Dear Sir:*—Since I heard last fall of your cutting and
Selling timber off my land I wrote you at the time of advertising) about it wishing
you to write me whether it was so or not but you have not took the trouble to write
to let me know whether it was or not. If you was innocent I should supposed
you would have as much as Stated it in a letter to me to that effect Huson was out
there this summer and States since he came back that the report is you sware you
will kill me and bury me Seven foot under ground I would ask what you would
kill me *for I have done you no injury have given you all the time to redeem we agreed* on
and have never interrupted you, in your business farmed Just as you pleased and
have not dictated you at all in any thing, only in cutting timber and said nothing
about that till your time was out, and I think you are verry unreasonable to threaten
of killing folks, that has been your friend, if I had not *bought at the time I did some*
*one else would and you would had no chance to redeem you* had your four years and done
nothing and now it is over five years and the land is taxed and that has got to be
paid by somebody this fall and I suppose it will be high also I thought when you
was here, I should never sell till I saw you but I have been unable.all last season
to do a days work and have not been able to come out and see you (I have not sold
any of it yet) *I have had a number of* applicants to bye but thought would first *write*
*to you, to let you know how it stands* and now want money I have been without it for
over 5 years, you have not paid a cent and even then threaten to kill me because you
cut and sell timber and I dont like it, when you know it is not right and I have been
so creditably informed that I believe it, because you did not deny it, if it had not been
true, why did you not like an honest man and a friend write to me all about it I
will now State to you the facts which are these if you ever mean to pay me for that
land I want you to do it, before the first day of September next, or ever after hold
your piece, you told me you could git the money there at any time so now git it and
fetch it on it is not anything you have said about me or any thing else, that I care
any thing about, but the cutting and Selling timber, to try to waste and destroy
the property which if you was trusty and I could depend on your not destroying
and making the place less valuable and pay *the taxes I perhaps should let you have a*
*far longer swing but if true what I hear you will most likely come and pay me for the*
*land before the first of September next which will be near* 5 *Years and three months, which*
*is a long time to be out of* my money and get nothing and worse than that it seems to
do you no good I cant hear as you have sowed much wheat, or raised much of any
thing, so you are no better off for making money than when I was there last which
will be 4 years this fall, I have not seen Post since I wrote you before I think or
have not this season, he is lame with the rheumatism and wrote me a while ago
that he wanted to see me before I go west and he would try to come out with me,
I suppose he thinks there will be taxes to pay, *I cant see your object to want so much*
*land and occupy so little,* you have had time with that tract to have *raised a good*
*many thousand bushels of Wheat and to have paid the most for all of it if you had*
worked as hard at that as you have for building Parks and Dams all to no purpose,
do you remember of going into a nine acre field once at my house in Starkey and
after you got to Fiero's you said by God it was so small you could not turn round
and had to back out if you had occupied them large lots at your country as well as
we have that you would cash *anough on hand to pay all off* for we have raised seve-
ral hundred dollars off of that lot have had as high as 30 bushels of Wheat to the
acre and had several crops and the same little lot is there now, covered with Bar-
ley and Wheat, I wish you to write to me as soon as you receive this and how

Wynkoop *v.* Cowing et al.

matters stand and are in that country I cant tell when I shall be there to be killed, but if you don't come, I shall have to come or sell, for I want my cash I cant see any cause why you should blow about me as you do but I am not affronted at you at all, or all you have said but I dont like to have the timber cut for that will reduce the value of the property and if the property must run down by *obliging you and giving you a long time* I had better by far sell all out at a low rate, and git my cash, for if a man obliges another and he goes right on, to injure him by wasting timber, when it is as valuable as it is in that country what motive could a man have in letting such a one stay and destroy when the intention was to do him good you see it is unjust and I would not thought it of you.

Yours Respectfully,    CALEB COWING.

Mr. Tobias Wynkoop.

please write Immediately, write Just as you feel and Just as it is and direct to Big stream Point Seneca Lake Yates County State how is the crops and how much that land is worth, or what it could be sold for.

Oct. 4th, 1848.

Mr. Tobias Wynkoop—*Dear Sir :*—I received your friendly letter August 12th '48 Stating they had you in Bonds or you would have been down and ajusted matters with me but after court you would be right down which was about the 5th September past you have not yet come nor have I heard anything from you or any one else how matter went about that scrape of cattle and I feel verry anxious to hear all about it and also if you still intend to come and *redeem the Post tract of land* before the close of navigation, if so I want to know about the time, so I can be at home for I have some inducements to go a Journey and if you are really a coming I shall not go, and also whether the land is assessed to you, or me, or and what part is to me and if you know how much the tax is this season, and if you mean to pay the tax all or a part, if only part what part you pay on, for it must be paid this season by some one it cant be put off any longer Just State what I may depend on so to not deceive me, and if *you cant redeem, dont let that hinder your coming down* I want to see you verry much, on some other matters as well as that, I am pretty hard run for money, I dont know when I can pay Post the remainder and he must have his interest by the day and principal by the time my bying in that country has drained me so I have been in real want of money and have to work like an old Negro to git along, it is now over six years since I bout and have never received a cent from it and have to pay out a good deal to go out and back and would you pay out all your moneye and wait on any one 7 years (do as you would be done by) do oblige me by writing all the particulars right off, so I may know what to depend on and the time you certainly will be here. Wheat is now 9 shillings pr Bush  Barley 5 shillings  Oats 2 shillings  My horse fell with me the other day and come verry near killing me and almost broke my left shoulder and am so lame I cant put on my coat alone, dont fail to come, I think it will be for your advantage, but write immediately whether you will or not and when you will be here if you come.

Yours Respectfully,    CALEB COWING.

My Respects to your wife and
family  Your friends I believe
are all well

W. B. Scates, Smith & Williams, and Blodgett & Upton, for Appellant.

Goodwin, Larned & Goodwin, and Ferry & Searls, for Appellees.

Breese, J. The question presented by the record in this case is, were the transactions between these parties of such a character, in relation to these lands, as to operate as a security for the loan of money merely, and to constitute in effect, a mortgage of the lands.

The maxim of equity is, once a mortgage always a mortgage, and the true character of every conveyance of land, is open to inquiry and investigation, no matter what form the parties may have given the transaction. *Ferguson* v. *Sutphen*, 3 Gilm. R. 565; *Miller et al.* v. *Thomas et al.*, 14 Ill. R. 428; *Smith et al.* v. *Sacket et al.*, 15 Ill. R. 528; *Williams* v. *Bishop et al.*, ib. 553; *Davis et al.* v. *Hopkins*, ib. 519.

The scope of the bill is, to establish the transaction between complainant and Cowing as a mortgage, notice of which, Bull, who is made defendant with Cowing, is alleged to have possessed, when he purchased of Cowing. The defendants were required to put in their answers under oath, and they both most emphatically deny the existence at any time, of any mortgage.

Full proof is required, in such cases, to countervail two sworn answers. The issue is one of fact, and we must determine it from the proofs submitted. They consist for the most part, of letters from Cowing to the complainant, written before and after the patents were issued to Cowing for the lands, all which we have examined with care.

It is insisted there are expressions in these letters, alluding to the terms of the original parol transaction of 1842, which determine it to be a loan, and the land taken in the name of Cowing as security, and that such should be the conclusion of the court thereon.

These letters do not purport to give the nature or character of that agreement, nor do any of the witnesses called to detail conversations with Cowing, attempt to state it. All that has been produced as to the terms, conditions and nature of this contract, consist of detatched parcels, incidentally stated in connection with other subjects, and they may all, with few exceptions, as well be referred to a sale as a loan and mortgage. Those exceptions are to be found in the letters of Cowing, of April 14, 1847, and May 1, July 21, and October 4, 1848.

In that of April 14, he complains of cutting timber on the land—hopes plaintiff will " act the fair man, pay the taxes and

not cut the timber and sell it," and says " try to make arrangements to raise the money if you mean to ever redeem against I come. I have given up buying any more in that country."

In the letter of May 1, 1848, he refers to a promise of plaintiff to come to New York and pay him and Post off—informs him of his purchase of Post's interest, and tells him he can have " until the second day of January next to redeem in,"—hopes he will keep the taxes paid and not waste or sell timber, and that he shall have, if he does right, " a good fat slice " of the land. In that of July 21, he refers again to his cutting and selling timber, and complains that he had not explained the matter to him—speaks of a report that plaintiff had threatened to kill him, and asks why he would kill him " for I have done you no injury—have given you all the time to redeem we agreed on,"—but says " if I had not bought at the time I did, some one else would, and you would had no chance to redeem." He then complains that he had had four years and done nothing—had not paid one cent, and the taxes were due—that he must have money and will sell, and reiterates the complaint of cutting and selling timber—says " if you ever mean to pay me for that land, I want you to do it before the first day of September next, or ever after hold your peace."

In the letter of Oct. 4, he inquires if he intends " to redeem the Post tract of land,"—wants to know to whom the land is assessed for taxes, and if he means to pay the tax—desires him to state what he can depend on, and if he can't redeem don't let that hinder your coming down—says it is now over six years since he bought and has never received a cent from it, etc.

If we were obliged to treat expressions and phrases used in conversation or in letters, and the language of unprofessional men in their extensive intercourse and various negotiations, in a technical sense, we should often violate their true intent and meaning. These letters afford an instance in which expressions, if technically understood, would refer to a mortgage, but which it is very clear from the whole letter, its purport and object, the writer never intended should have such a meaning. The solitary word, redeem, is explained by the phrase in the same letters, that he had bought the land, but that, it was understood always, that the plaintiff should have it, in preference to all others, if he paid for it, and a time of payment is specified.

The term, redemption of land, can only apply, technically, when the land is held in pledge or mortgage, and is not descriptive of the acquisition of land by purchase, nor of the re-payment of a loan, whereby land in pledge is relieved from its liability for the loan.

We must endeavor in this case, as in all others, to arrive at

the very truth, and the true intent of the parties unless prevented by some act of the party—here no estoppel interferes to shut out the truth. If we were guided alone by the light afforded by these passages in the several letters referred to, and by what Cowing said as to having purchased the land for the plaintiff, in the hearing of witnesses, we might possibly, arrive at the conclusion, that there was a mortgage ; yet on a view of the whole case, as it really exists in the record, we find the most conclusive proof that the original transaction was a sale, and not a mortgage. The defendants most positively deny, and that under oath, which was required of them, the existence, at any time, of any mortgage. These sworn answers cannot be overcome by resorting to a technical meaning of certain phrases in the letters and conversations of Cowing, especially when other portions of the same letters most clearly show that he claimed the land as absolute owner, and as such, makes frequent complaint of acts of waste in cutting and selling timber by one long indulged with extended opportunities of paying for it, and becoming himself the owner.

Any doubt that might rest upon the mind, arising from these passages and expressions in his letters and conversations, is completely removed by the written agreement of January 3, 1849. In that no intention to mortgage, or any recognition of such having been the nature of the original agreement between the parties, can be discovered. On the contrary, the parties have set forth by way of *recital*, as clearly as language can express it, that the first transaction was a sale, and not a loan and mortgage. The bill of complaint insists upon this agreement as a valid and subsisting agreement, and claims to have it enforced as such. The agreement recites, " That said Cowing is the owner of one thousand five hundred and twenty acres of land in township number forty-four north, of range eleven east in Lake county in the State of Illinois, now in possession of said Wynkoop under a forfeited contract for the purchase of the same." There is no suggestion in the bill that there was any fraud or circumvention used in drawing, or executing this agreement, and for anything alleged or proved, it fairly and fully expresses the intention of the parties. We must regard it as their deliberate act, and as expressing truly their meaning. In it reference is made to the real character and nature of the original transaction, and the then condition and position of the parties under it, as being that of " a forfeited *contract* for the *purchase* of the same." The parties have, by this recital shown an intention to declare by that instrument, the nature and character of the former transaction, and have so declared it, in the recital. It is done, too, in language not susceptible of two

meaniugs, and clearly shows that the first contract was one of purchase and not of loan. A mortgage is not, in any sense, common or technical, a purchase, and language cannot be so forced as to make this to mean a loan or a mortgage. Nor is there in any part of this instrument any language used or intent shown, repugnant to this recital, or importing, in the smallest degree, any other or different fact.

If this agreement is to be regarded—and it is referred to and made part of the bill as an exhibit—it is admitted by the answer, and offered in evidence by the plaintiff—it must be conclusive upon the issue of fact, whether the parol agreement of 1842, was a loan secured by taking the title in fee, direct from the United States to Cowing, in the nature of a mortgage as between Cowing and the plaintiff, or whether it was a sale by Cowing to the plaintiff. We cannot but regard it as a sale, and this conclusion seems perfectly consistent, with all the testimony, whether by letters of Cowing's or by witnesses sworn in the cause. But we might go further and say, even if the evidence was clear, that a loan and mortgage had been made in 1842, that agreement was merged in the agreement of January 3, 1849. If not so, then this last agreement must be treated as void because of its repugnance to the first, for no court could hold it valid to secure the mortgagor the extended credit provided in it, and at the same time relieve him from all its effect upon his own right and interests.

Although parties may not at the same time, and by the same instrument, stipulate for converting a loan and mortgage into an absolute purchase upon the happening of a subsequent event, yet it is also true, that a subsequent *bona fide* and fair agreement for the purchase and extinguishment of the equity of redemption for a valuable consideration, will be sustained, and such this appears to have been. The plaintiff, has all along, treated the first transaction as a mortgage, and has set it up and insists upon all his rights under it. But he has mistaken the true character of the last agreement. As the first was a mortgage, as he insists, so also he assumes this last agreement is in the nature of a security for the debt and must therefore partake of the original transaction. This is so, as a principle, for the unrestricted right of redemption will be extended to transactions between the parties, in the nature of security for the debt, subsequent to the original mortgage. 1 Hilliard on Mortgages, 48, sec. 18; *Bloodgood* v. *Zeily*, 2 Caines' Cases in Error, 124. But it is of no avail to speculate on this topic, for we have already expressed the opinion, that the whole evidence shows the first transaction was a sale, and we look to the recitals of the last agreement to ascertain the real terms and conditions and true character of the first. Both

parties are estopped by the recitals in it, and must be bound by their own admissions of the facts stated in it. They must be taken to be true, else, the agreement would not have been executed. 1 Greenl. Ev., sec. 23; *Crisman et al.* v. *Matthews*, 1 Scam. R. 148; *Cowen* v. *Jackson et al.*, 4 Peters, 85.

Although it be true, that courts will not be estopped from looking into all the facts and circumstances, by a deed absolute on its face, to ascertain whether a loan of and security for money was really intended, yet if there be no fraud, or circumvention in procuring it, parties must be bound by, and be estopped from averring anything against their own deliberate recitals, admis sions and agreements, especially when such averments would prejudice and work injury to others who have acted in good faith upon the existing or supposed state of facts, in such a manner as would produce wrong and injury to be now overturned.

Such would be the condition of both Cowing and Bull.

Cowing forbore to assert his rights, during the long credit given, and when he did assert them, he did it upon terms of being rid of the agreement, by making time in its performance of its essence. Bull purchased upon the faith of the existing facts, rights and powers, as recited and provided in the agreement of January 3, 1849, and has paid his money relying upon their truth and binding obligation upon the parties to the instrument.

To allow the plaintiff to avail of the time and terms of that agreement, and on failure to comply with its provisions, and after an innocent party had purchased in good faith and paid his money relying upon the plaintiff's own written admissions, now to avoid them, or construe them into a mere defeasance, would enable him to perpetrate a fraud upon both defendants.

Admitting in its fullest legal extent, the doctrine of notice of all plaintiff's equities, as properly chargeable upon Bull, yet those equities must be limited to plaintiff's rights as fixed by the agreement of January 3, 1849, and we cannot apply the doctrine of notice, simply from possession in its general sense, and send Bull to the plaintiff to make inquiry, for that doctrine cannot apply where possession is declared to be under a written instrument. The instrument itself explains the possession, and it is no more open to contradiction or explanation, than any other obligation contained in it. What does this instrument tell Mr. Bull and all others? In the second article it is declared—

2. "The said Wynkoop hereby surrenders to the said Cowing, the actual possession of the said lands and every part thereof, and acknowledges himself to occupy the same as a

tenant at will of the said Cowing and liable to be removed from such occupancy at the will of said Cowing."

Bull being notified of this agreement, as fixing and controlling the rights of both parties, and the condition and character of the estate, took the land subject to all the equities of the plaintiff as they existed and appeared under that agreement, and he cannot now be made to yield to a state of facts wholly inconsistent with the provisions of this agreement, and depending too, upon parol proof to show them.

We cannot imagine a case, wherein the doctrine of estoppel, was more necessary to protect the innocent, even if the truth was, as is alleged, that the original agreement was a mortgage, for if it were so, it was by parol only, and nothing existing but the plaintiff's possession to operate as notice to put incumbrancers and purchasers upon inquiry. When therefore, such a mortgagor deliberately enters into a written agreement with his mortgagee, in which he recites that his possession was under a forfeited contract to purchase—that he had surrendered the possession and then held as a tenant at will with a right to sell within a limited period so much of the land as would pay a certain sum, and thereby become owner of the residue if any, we cannot hesitate to apply the doctrine of estoppel in all its cogency, for the protection of a purchaser from the alleged mortgagee, unless the mortgagor shall show, by incontestible proof, that there was a mortgage in fact, and not a sale, and that such purchaser had *actual* notice of it, and not merely constructive, by such possession.

Finding then, no evidence of a mortgage, or previous mortgage relation between the plaintiff and Cowing in that agreement, nor anything squinting towards it, but on the contrary, evidence quite conclusive that both transactions amounted to a sale of the lands, all the equities are clearly with the defendant Bull.

The essential fact, that of the existence of a mortgage being wanting, we might dismiss the case, without comment upon the question of performance of the agreement in its true spirit, but as the proofs were taken and argument and authorities adduced upon this question, we will notice the evidence to that point.

Treating the agreement of January 3, 1849, as a contract of purchase—the most favorable view for the plaintiff—we find that the time of performance is made of the essence of the contract, and is one of the most essential conditions on which the rights of the plaintiff depend.

Parties may make the time for the performance, one of the conditions of the contract, and when they do, courts of equity will not relieve a party from default, where the other party has

not waived it or acquiesced in it. *Smith* v. *Brown*, 5 Gilm. R. 314; *Glover* v. *Fisher*, 11 Ill. R. 673; *Kemp* v. *Humphreys*, 13 ib. 573; *Chrisman* v. *Miller*, *ante*, 227.

They can annex their own condition to their deeds or contracts, so that they be not against the policy of the law. A condition in a deed may be annexed to every species of estate and interest in real property—to an estate in fee, in tail, for life or years, in any lands or tenements. 2 Cruise's Dig., Title 13, chap. 1, sec. 9; 1 Hilliard on Real Estate, chap. 27, sec. 11. This principle is not questioned.

The condition in this agreement, reserved the right in the vendor to sell and dispose of one-third of the lands, after the first day of June, 1849, and the residue during the year 1850, if the plaintiff did not sell enough to pay the consideration agreed on by the first named day; and there was this proviso, that Cowing would not exercise such right during either year, if the plaintiff should proceed with reasonable diligence to make sales. Admitting that this proviso qualifies and restrains the reserved power, still, the phrase " shall proceed with reasonable diligence in the sale of said lands," must have a reasonable construction in order to carry out the intent, which was to make a sale, or raise the money in some way, to pay the agreed consideration. The agreement does not provide that the plaintiff may sell a part before the first of June, 1849, and the remainder afterwards, unless the restriction upon the power of sale reserved to Cowing is to be construed, as carrying that intent. We think it was a reservation rather, of a right in Cowing to make partial sales at different periods of time, to be exercised, on plaintiff's inability to make a sale for the whole sum designed to be raised, before the first of June, 1849.

But giving it the largest sense in favor of the plaintiff, still he fails to bring himself within its provisions. It may be admitted that Cowing's right was limited to one-third in 1849, and the power remained in the plaintiff to sell that third at any time before a sale should be effected by Cowing; and so during the year 1850, not only of that third, but of the residue, yet the plaintiff failed to make any such sale at any time, nor did he make a tender of money raised, no matter how, as a substitute.

Had the plaintiff made such a sale or sales, or tendered the money during the year 1850, he would then be in a position to raise the question he has raised upon the construction of this agreement.

But there is no real ground to contend, that the provisions of this agreement would render a sale made by Cowing in 1850, void or voidable at the instance of the plaintiff, although he had neither sold any part of the land, nor made a tender of any

money in fulfillment of the agreement until June, 1851. Such a construction of the agreement, would be in disregard of the condition as to the time of performance, which qualified the plaintiff's rights as a purchaser, and reserved the vendor's right to rescind the contract by a resale of the premises. The sale was good as between Cowing and Bull, whether made before or after June 1st, 1849, and it must also be good as between the plaintiff and the defendants, unless the plaintiff can avoid it by showing a compliance on his part with the agreement.

This he cannot do without showing a tender of the consideration money within the time, as he has failed to show any sale, unless we construe the contract as suspending Cowing's power by that kind of diligence set up here, consisting of inquiries after purchasers, and offering the lands to those known not to desire to purchase. Diligence of this kind, might suspend Cowing's right to rescind by a resale, to an indefinite period. We apprehend the diligence contemplated by the parties, was a successful sale bearing solid fruit, and not unsuccessful efforts, and abortive attempts to make sales.

As to the tender, both defendants positively deny it. The plaintiff shows by one witness only, that he and his witness went to Bull in November, 1850, when he informed Bull that he had come to fulfill the contract, and offered him the first payment— then the first two payments, and finally, the full amount with interest. It is not stated that any money was exhibited, or, indeed, that he had any money to make good his offers, and if so, what kind of money, coin or currency.

The testimony of one witness uncorroborated, cannot prevail against a sworn answer, even if we could understand the offer as including a tender or actual exhibition of the money. A count of the money may not be necessary where the party absolutely refuses to receive it, or have anything to do with it. But all these may not dispense with the existing ability to make the payment, that is, the actual possession of the money, or having it within convenient reach.

The proof of tender in June, 1851, is equally insufficient and unsatisfactory. It was proved by one witness only, and not corroborated by a single circumstance. It was also too late. It is shown to have been on the 3rd of June, 1851, to Bull, and on the 4th of June to Cowing. Cowing admits an offer of paper money, but denies a tender of money, he objecting to anything but gold or silver coin. The plaintiff has offered no explanation or contradiction of this statement. Neither the proof of time, or kind of money is sufficient to sustain these acts as a tender in June, 1851.

The evidence of performance or readiness to perform by the plaintiff, is insufficient to entitle him to a decree for a specific performance, was that the scope of the bill, as he has shown neither a compliance with the terms of the agreement, nor proved a tender of the purchase money. A tender is *stricti juris*, (*Buchenan* v. *Horney*, 12 Ill. R. 336,) and the money must be in sight, and capable of immediate delivery, and the tender must be absolute, (2 Greenl. Ev., sec. 601–2–5,) unless the production of the money be dispensed with by the absolute refusal of the creditor to receive it. 3 Stark. Ev. 1067. Nor would it be in our power to give relief by a decree for a specific performance, on a bill framed solely upon the ground of a right of redemption as a mortgagor as this is.

The decree of the Circuit Court is affirmed.

*Decree affirmed.*