THE HOLDEN LAND AND LIVE STOCK COMPANY et al.,
  *Appellants*, v. THE INTER-STATE TRADING COMPANY
  et al., *Appellees*.

No. 17,828.

THE HOLDEN LAND AND LIVE STOCK COMPANY et al.,
  *Appellees*, v. THE INTER-STATE TRADING COMPANY
  et al., *Appellants*.

No. 18,053.

SYLLABUS BY THE COURT.

1. MORTGAGES—*Agreement for Forfeiture—Not Enforceable.* An
agreement by a mortgagor that he will forfeit all interest in
the mortgaged property if he fails to pay the debt secured by
a fixed time will not be enforced, although made after the
execution of the mortgage.

2. ——— *Deed Absolute in Form—No Devestment of Title.*
Where by the agreement of the mortgagor and mortgagee the
note secured and a deed for the mortgaged property from the
mortgagor to the mortgagee are deposited in escrow, both to
be delivered to the mortgagor if he pays his debt by a certain
date, otherwise the note to be delivered to him and the deed to
the mortgagee, the delivery of the deed in accordance with the
agreement does not devest the mortgagor's title.

3. ——— *Same.* If such a deed is regarded as taking effect at
the time of its deposit in escrow, the continued existence of
the indebtedness thereafter characterizes it as a mortgage.
If it is regarded as taking effect at the end of the designated
period it is invalid as an absolute conveyance of title, because
it is an attempt to procure in advance a release of the equity
of redemption.

4. ——— *Deed Absolute in Form—Right of Redemption—Inter-
est.* When a deed has been given under such circumstances
that it amounts to a mortgage, the fact that the grantor
accepts and signs a lease of the property from the grantee does
not preclude him from asserting his right to redeem.

5. ——— *Same.* Where a party asks a court to declare a deed
to be in effect a mortgage, he may be required, as a condition
to receiving such equitable relief, to forego the advantage of
any statutory penalties for the exaction of usury, and submit
to a charge of the principal of the debt and legal interest.

Appeal from Shawnee district court, division No. 1.
Opinion filed May 11, 1912. Modified.

*Charles Blood Smith,* and *Edward P. Garnett,* for The Holden Land and Live Stock Company and Howard M. Holden.

*Ferry, Doran & Dean,* and *Elijah Robinson,* for The Inter-State Trading Company, The National Bank of Commerce of Kansas City, Missouri, and George T. Cutts, as receiver of the bank.

The opinion of the court was delivered by

MASON, J.: On June 6, 1901, the Holden Land and Live Stock Company executed to the Mutual Benefit Life Insurance Company a mortgage for $90,000, due in five years, upon a tract of land in Shawnee county, containing about 5603 acres, of which it was the record owner. On July 1, 1901, the Holden company executed a note to Howard M. Holden for $82,000, secured by a second mortgage on the same tract. This note and second mortgage, with other security, Holden at once transferred to the National Bank of Commerce of Kansas City, Missouri, to secure his note to that bank for $80,000, bearing the same date, due in one year and drawing eight per cent interest, which was subsequently renewed. Holden had personally purchased a tract of land in Missouri, borrowing a part of the amount necessary for the purpose from the bank. To secure the bank the deed was made to one W. H. Winants. Afterwards it was agreed that he should hold the title as further security for Holden's note to the bank. In May, 1904, Holden caused to be executed to the Inter-State Trading Company deeds covering the tracts in Kansas and Missouri, less parts of the former that had been sold, most of the proceeds having been applied to cutting down the incumbrances. On February 13, 1908, Holden and the Holden company brought an action against the bank and the Inter-State Trading Company, alleging in substance that the deeds had been given by way of security for the indebtedness owing to the bank, and asking, if this should be found to have been

paid in full, a decree quieting title; otherwise, a decree declaring title to be held under the deeds as security for whatever balance should be found due. The defendants maintained that the deeds were intended as absolute conveyances, and operated as such. The court found, in accordance with the report of the referee before whom the case was tried, that the defendants were precluded, by their course of dealing with the plaintiffs, from claiming the absolute title to the land; that the plaintiffs should be allowed to redeem it by paying the defendants what they had in it, amounting at the time the action was begun to $81,091.93, this including the first mortgage, which the bank had purchased; judgment was rendered that if the plaintiffs should pay this amount (which had been reduced to $65,233.67 by sales of land made during the litigation) within six months their title should be quieted; that if they failed to make the payment within that time they should be barred of all interest in the land. The defendants appeal on the ground that the court should have denied the plaintiffs any relief whatever. The plaintiffs appeal upon two principal grounds: (1) that in the accounting they should not have been charged with interest on the note given to the bank, because by the exaction of usury all interest thereon had been forfeited; and (2) that the first mortgage should not have been enforced against them otherwise than by a foreclosure and sheriff's sale.

The plaintiffs complain of some of the findings of fact made by the referee and approved by the court. The objections have been examined, and are found not to be well taken. The findings will therefore be spoken of as the established facts. The details of the transactions will be stated no further than is thought necessary to present the questions of law that are regarded as controlling.

The flood of 1903 rendered a part of the Kansas land temporarily unproductive, and occasioned loss to

Holden, who in consequence failed to keep up his payments of interest and taxes. The deeds in question were executed in connection with two written contracts, entered into on May 12 and May 14, 1904. The referee found that these contracts were intended to include and did include all matters in negotiation between the parties up to the time of their execution. The defendants maintain that they show that the deeds were intended as absolute conveyances, and that oral evidence is not admissible to give them a different effect. We reach the conclusion, however, that the writings themselves, interpreted in the light of the situation of the parties, show that under the law the deeds did not devest the mortgagor of the right to redeem the property.

The contract of May 12 was made between the Inter-State Trading Company and Holden. This company was a corporation organized, owned and operated by the bank, for its own convenience, and for practical purposes the bank and the corporation were the same. The Holden company sustained the same relation to Holden. The contract recited that Holden had caused to be conveyed to the Trading company the absolute title to the lands in question, and had transferred to it various stocks, bonds and notes, which were held as collateral security for the same indebtedness; that in consideration thereof the Trading company had paid Holden's note to the bank for $77,873.90, and also the sum of $6253.30 advanced by the bank to keep down the taxes and the interest on the first mortgage; provision was then made that Holden, until November 9 following, was to have the right to sell the property, as the agent of the Trading company, for not less than the sum of the amounts named, with interest, he to retain as commission anything in excess of that sum. At the time of the execution of this contract the Holden company executed the deed to the Kansas land, which was delivered to the Trading company, and Holden

authorized Winants, in writing, to make a deed convey-
ing the absolute title to the Missouri land to the Trading
company.

A mortgagor may, of course, sell the mortgaged
property to the mortgagee, although the transaction
will be scrutinized closely to determine its fairness—
being almost as much open to suspicion, it is said, as a
purchase by a trustee from his beneficiary. (*Villa v.*
*Rodriguez*, 79 U. S. 323.) It is also said that a con-
veyance of the mortgaged premises from the mortgagor
to the mortgagee will be regarded as a mere change in
the form of security, unless it clearly and unequivocally
appears that both parties intended otherwise. (*Ennor*
*v. Thompson*, 46 Ill. 214; *Skeels v. Blanchard*, [Vt.
1911] 81 Atl. 913, 915.) It may be assumed that this
contract on its face contemplated an actual sale, leaving
Holden with nothing but a right to repurchase within
a fixed time for a stated price. But so far as there is
any inconsistency between the two, this contract must
yield to that of May 14, which was executed by the
bank, the Trading company, Holden and the Holden
company. The second contract recited that the bank
had deposited with James A. Patton (an agent of the
bank) Holden's note to the bank for $77,873.90 (with
some collateral security), and a demand note for
$6253.30 which Holden had given the bank May 12
(being for the taxes and interest on the first mort-
gage) ; that the Trading company had deposited with
Patton its note to the bank for $83,675.32, due Novem-
ber 9, 1904; that Holden had deposited with Patton a
bill of sale, transferring to the Trading company the
bonds, stocks and notes securing Holden's note, and
deeds to the Trading company for the Kansas land,
executed by the Holden company, and for the Missouri
land, executed by Winants; the provision was made that
if Holden's notes were paid by July 9, 1904, Patton
should deliver to Holden the notes, the collateral and

15—87 Kan.

the deeds; if the notes were not paid by that date Patton should deliver the bill of sale and the deeds to the Trading company, deliver the Trading company's note to the bank, and surrender Holden's note to Holden. This contract was extended several times, the last extension expiring October 11, 1904, but finally delivery was made, as directed in the event the notes were not paid by the date fixed.

Plainly the second contract superseded the first. It recited the delivery in escrow by Holden to Patton of documents which the first contract represented him as already having delivered to the Trading company. The first contract recited that Holden's note and his obligation for $6253.30 had been paid, while the second one showed them still to be in full force. The case must be determined by the effect of the second contract. What it in substance amounts to is this: Holden, the mortgagor, and the bank, the mortgagee, agree that Holden is to have until July 9 to pay his debt; if he fails to do so he is to relinquish all claims to the land and the bank is to become the owner. The Trading company's function is merely to provide a method for carrying the property in the guise of commercial paper if the bank should become its owner. The deposit of the instruments in escrow does not affect the character of the transaction. It is but a device to insure performance. The important question is, what rights did the law give the parties under this arrangement, rather than what did they conceive their rights to be.

It is a familiar and undisputed proposition that no force will be given to a stipulation in a mortgage (or in a deed intended as a mortgage) by which the mortgagor agrees that if he fails to make payment by a stated time the mortgagee shall become the absolute owner of the property. (27 Cyc. 1098.) It is equally well settled that no effect will be given to such an agreement made separately from the mortgage, but at the same time. (11 A. & E. Encycl. of L. 243.) This

principle renders ineffectual the deposit of a deed in escrow by the mortgagor at the time he gives the mortgage, for delivery to the mortgagee if he fails to meet his obligation promptly; otherwise the rule could be readily evaded. (*Plummer v. Ilse*, 41 Wash. 5, 82 Pac. 1009, and note to same in 2 L. R. A., n. s., 628.) It is often said that after the execution of a mortgage the mortgagor may release to the mortgagee his "equity of redemption"—using the term to denote his right to redeem after his default, or more properly, his actual title to the property, not referring to the statutory right to redeem after a sale on foreclosure. (11 A. & E. Encycl. of L. 243; Note, 55 Am. St. Rep. 105; 3 Pomeroy's Equity Jurisprudence, 3d ed., § 1193, Note 1, p. 2371; 2 Jones on Mortgages, 6th ed., § 1045.) What is meant, however, as is shown by an examination of the cases cited in support of such statements, is merely that the morgagor may, at any time after the execution of the mortgage, sell to the mortgagee outright all his interest in the property, by a conveyance operating at once, and in that sense release his right to redeem. But he can not, even after the mortgage has been made, bind himself by an agreement that if he does not pay his debt by a certain time in the future he will forfeit all right to the property. The recognition of such a right in a few cases, of which *Bradbury v. Davenport*, 120 Cal. 152, 52 Pac. 301, is an example, seems to result from a failure to note the distinction referred to. Considerations of public policy forbid the enforcement of a contract made by the borrower at the inception of his loan, that he will forfeit his interest in the property he offers as security if he fails to meet his obligation promptly; the same considerations apply with equal force where he makes a like contract upon a renewal of the loan or an extension of the time of its payment. To hold otherwise would be to deprive of the benefits of the rule those most in need of its protection. If at any time after the

execution of a mortgage, the mortgagee could, by an extension of time or upon any other new consideration, obtain from the mortgagor a valid agreement that if he did not pay the debt in full by a certain date he should forfeit the entire security, then virtually the ancient common-law mortgage would be still in vogue, its rigors unrelieved by any equity of redemption. The modern tendency is to extend rather than to contract the scope of equitable relief against forfeitures.

"There is no principle in equity better settled, than that every contract for the security of a debt, by the conveyance of real estate, is a mortgage; and all agreements of the parties, tending to alter, in any subsequent event, the original nature of the mortgage, and prevent the equity of redemption, is void. If the conveyance, or assignment, was a mortgage in the beginning, the right of redemption is an inseparable incident, and can not be restrained or clogged by agreement." (*Henry v. Davis*, 7 Johns. Ch. 40, 42.)

"The maxim, once a mortgage always a mortgage, does not cease to be applicable on the execution of the instrument, and will, on the contrary, invalidate a subsequent agreement tending to preclude the exercise of the right of redemption." (Leading Cases in Equity, White & Tudor, p. 1984, note.)

"Once a mortgage always a mortgage, may be regarded as a maxim of the court. Equity is jealous of all contracts between mortgagor and mortgagee, by which the equity of redemption is to be shortened or cut off. The mortgagor may release the equity of redemption to the mortgagee for a good and valuable consideration, when done voluntarily, and there is no fraud, and no undue influence brought to bear upon him for that purpose by the creditor. But it can not be done by a contemporaneous or subsequent executory contract, by which the equity of redemption is to be forfeited if the mortgage debt is not paid on the day stated in such contract, without an abandonment by the court of those equitable principles it has ever acted on in relieving against penalties and forfeitures." (*Batty v. Snook*, 5 Mich. 231, 239.)

"Where land is conveyed to another by a deed, absolute on its face, but to secure the payment of money,

and the grantee gives the debtor a written agreement to convey the land on payment of the debt, the conveyance will be a mortgage only, and its character will not be changed by giving a new note and taking a new agreement to convey, in which time is made of the essence of the contract, and which provides that in case of failure to pay on the day named, 'the intervention of equity' shall be forever barred;—the relation of mortgagor and mortgagee will still exist." (*Tennery v. Nicholson*, 87 Ill. 464, syl. ¶ 1.)

. A valuable article upon "The Clog on the Equity of Redemption," in 21 Harvard Law Review, 459, 466, cites *Wynkoop v. Cowing et al.*, 21 Ill. 570, as holding that an executory contract for the release of the equity of redemption may be held valid if made subsequently to the mortgage. The court there decided that the original transaction was a sale and not a mortgage, and what was said as to the release of the equity of redemption was avowedly dictum. The precise point here under consideration was not discussed.

If the deeds to the Trading company are conceived as taking effect at the time of their deposit in escrow, or at the time of their first delivery to the Trading company, then they amounted to mortgages under the usual test—the continued existence of the indebtedness. (*McNamara v. Culver*, 22 Kan. 661; 1 Jones on Mortgages, 6th ed., §§ 264, 265; 27 Cyc. 1010.) If the parties by the plan outlined in the first contract intended to carry out an arrangement the legal effect of which would be to pass the title to the land, leaving Holden only a right for its repurchase, they are shown by the second contract not to have consummated their purpose, but to have voluntarily abandoned that course and adopted one of a radically different nature, which made the deed, which had been signed and acknowledged, but not finally delivered, in effect a mortgage. The second contract distinctly recognizes the notes as subsisting obligations of Holden, and the loss of his title to the land is made to turn upon whether or not they are paid

by a certain date. This feature is the more noticeable because the first contract professed to show that the indebtedness had been extinguished. It is true that the notes were to be returned to Holden at the end of the period fixed, whether they were paid or not, and in the meantime they were in the hands of a third party, so that he was well protected against the enforcement of a personal liability upon them. But the fact remains that they were not to be returned to him until the expiration of the time named, and in the meanwhile he was not entitled to them. The existence or nonexistence of an indebtedness is of importance in determining whether a transaction is a sale or a mortgage because it interprets and gives character to the language and conduct of the parties. The practical likelihood of the debtor being called on to respond to a personal liability is not an element in the determination of the matter. It is not material to inquire what purpose of the bank was subserved by the continued existence of the notes—it is enough that they were for some reason kept alive, and Holden remained a debtor to the bank. In November, 1904, Patton offered to deliver the notes to Holden, but he refused them. In February, 1906, the assistant cashier of the bank delivered them to him. The note of the Holden company was never returned.

Two Kansas cases are cited as supporting the view that the deeds to the Trading company passed an absolute title. They are *Martin v. Allen*, 67 Kan. 758, 74 Pac. 249, and *Fabrique v. Mining Co.*, 69 Kan. 733, 77 Pac. 584. In the former Martin owned land subject to a mortgage and several other liens. He deeded it to Allen, who assumed the payment of all Allen's indebtedness, and agreed to reconvey to Allen at any time within three years, upon payment of the amount with interest. The transaction was held to be a sale and not a mortgage, because there was no indebtedness owing from Allen to Martin at any time. Allen continued to be indebted to the mortgagee and to the holder of a

judgment lien, but they were strangers to the deed. The second case cited was entirely similar in principle, although there the grantee in the deed, who assumed and paid a number of the grantor's debts, took an assignment of a mortgage. As this had been foreclosed before the deed was made the judgment had probably been released. At all events the case was decided upon the theory that there was nothing owing from the grantor to the grantee. In the present case Holden was not indebted to the nominal grantee, the Trading company, but the bank was not a stranger to the transaction. It was the real party in interest—the actual beneficiary of the deed. No consideration moved from the Trading company to Holden. It neither assumed nor paid his debts. The contract was between the bank and Holden—the mortgagee and the mortgagor. (See in this connection *Marshall v. Thompson,* 39 Minn. 137, 39 N. W. 309.)

On October 12, 1904, the deed to the Kansas land was recorded. Holden on learning of the fact filed for record (on November 7, 1904) his copy of the contract of May 12, to which he added an acknowledged statement that the deed, with the contract, constituted, if anything, only a mortgage upon the property. On February 16, 1905, a lease for the Kansas land for that year was executed from the bank to the Holden company, the rental named being $10,000. Holden, who had been in continuous possession, paid to the bank the income of the property, amounting to $8300.57. No request was ever made for any further payment on that account. Holden continued in possession until this action was begun. The lease was not formally renewed. He paid the income for 1906 to the bank—$5005.78. In 1907 it received from a wheat crop $472.95. It is argued that the making of the lease was a recognition by Holden of the bank's ownership of the property. We regard it only as a circumstance to be weighed with other matters in determining the attitude of the parties. (*Wright*

*v. Bates & Niles,* 13 Vt. 341.) It is capable of the explanation offered by the plaintiffs that it was a method of pledging the income to the bank to apply upon the debt. That no request was made for any balance gives additional plausibility to this view. As the formal legal title was in the bank (or in the Trading company for the bank) the execution of the lease was a natural step, conforming to that situation, although Holden still claimed to be the equitable owner. The lease was not more significant of the actual title than a deed, and he had already placed upon record his declaration of his claim that the deed constituted only a mortgage.

We agree with the referee and the trial court, that whatever may have been the legal effect of the writings entered into by the parties, their subsequent conduct was such as to preclude the defendants from denying to the plaintiffs a right to redeem the property. It was worth at the time of the contracts $60,000 above the liens against it. Holden continued to negotiate sales of parts of it, incurring considerable trouble and expense. Commissions were paid by the bank to him, but he turned them over to the agents who had made the sales. With the consent of the bank he retained in two instances a part of the proceeds. In order to carry through one sale he included an unincumbered tract of his own, the bank knowingly receiving the benefit. The bank kept what it called the Holden Collateral Account, in which record was made of the amounts received and disbursed in connection with the property referred to. This, however, was a matter of convenience and in accordance with its usual plan of carrying real-estate assets. At the request of the federal banking officials a deed was made by the Trading company to the bank in the early spring of 1905. Holden expended considerable sums in permanent improvements on the property. No accounting was had or asked by the bank concerning these expenditures or the rent account for three years. As sales of parts of the Kansas land were made

the bank executed partial releases of the mortgage given by the Holden company to Holden, and by him transferred to the bank, the releases reciting that the mortgage was still in force. We think that, upon any theory of the effect of the contracts, the bank must be deemed to have permitted Holden to act upon the assumption that he was to have the benefit of his exertions, and was to own the property whenever the bank had received the amount of its claims, with interest and expenses. Having allowed Holden to act upon this conception of his rights the bank can not deny him the privilege of redemption.

Pending the litigation the rights of the defendants were transferred to the Terrace City Realty and Securities Company. Holden has died since the cause was submitted, and it has been revived in the names of the successors in interest. The issues are not in any way affected by these changes. The trial court having concluded that the plaintiffs had only an equitable right to redeem the property, rendered judgment accordingly. As this court concludes that the relations of the parties have at all times been in effect that of mortgagor and mortgagee, the appropriate remedy is a foreclosure and sale. In effect, at least, the indebtedness is now all extinguished except a part of the first mortgage, the precise situation depending upon the application of payments. There would be no purpose in attempting to apportion the remainder between the first and second mortgage, and the order will be made for the sale of the property to pay the balance due.

Usury was charged and collected upon the Holden note. By the national banking act the exaction of usury destroys the interest-bearing quality of a debt. The referee decided that the plaintiffs were estopped from claiming the benefit of that provision. Nothing was said about usury until the present action was begun. Whether or not an actual estoppel has arisen, it was proper under the circumstances, in view of the

equitable relief sought, that the plaintiffs should be charged with the principal and legal interest.

"When the borrower appears in any capacity in a court of equity asking affirmative relief against a usurious contract to pay money such relief will, in the absence of statute providing otherwise, be granted him only upon condition of his doing equity, that is, tendering the money actually due. . . . The rule . . . applies when the relief sought is the reformation or cancellation of a deed, or mortgage, or other instrument evidencing or securing a usurious debt, or an injunction against threatened damaging action by the creditor, or in fact, whatever be the character of the relief sought. . . . In case the usurious interest has been reserved, or paid in advance, the amount equitably due is the principal debt less the usurious excess of interest paid. In the absence of statute providing otherwise if the contract for the usurious interest is still executory the sum equitably due is the principal debt with legal interest thereon." (39 Cyc. 1010-1012.)

The plaintiffs complain of the action of the trial court in dividing the costs, but that is a discretionary matter, not ordinarily subject to review (Civ. Code, § 615), and there is nothing in the present case to suggest an abuse of discretion.

The judgment will be modified by requiring the lien upon the Kansas land to be enforced by sheriff's sale, subject to the statutory right of redemption. Otherwise it is affirmed.