No. 29,125.

The Fidelity and Deposit Company of Maryland, *Appellee*,
v. R. Lee Davis, *Appellant*.

(284 Pac. 430.)

Opinion filed February 8, 1930.

*Thomas C. Wilson, Henry Lampl* and *Rupert Teall,* all of Wichita, for the appellant.

*H. W. Hart, Glen Porter, Enos E. Hook, Edward H. Jamison* and *Getto McDonald,* all of Wichita, for the appellee.

The opinion of the court was delivered by

Jochems, J.: This action was brought by the plaintiff, a surety company, upon an indemnity contract given by the defendant in connection with an application for a bond. Judgment was entered by the trial court in favor of plaintiff upon a motion for judgment upon the pleadings.

The petition sets forth the following situation: The defendant applied to plaintiff for a fidelity bond on January 16, 1918. This bond was executed and delivered to the American State Bank, Kansas City, Mo., of which bank the defendant had been elected president, and was in the amount of $5,000. The bank began business on January 16, 1918, and closed its doors on April 30, 1923. A thorough investigation of accounts and of the condition of the bank was made by the commissioner of finance of Missouri, and it was discovered that the defendant Davis was short in his accounts in the sum of $12,384.69, "due to the acts of larceny, embezzlement, fraud, dishonesty; forgery, theft, wrongful abstraction or unlawful misapplication," which acts were within the indemnity of the bond. There-

after the plaintiff paid to the commissioner of finance in charge of the defunct bank the full amount of its bond of $5,000 and took therefor the receipt of Charles M. Blackmar, attorney for the commissioner of finance. Attached to the petition was a copy of this receipt (exhibit 3); copy of an itemized statement of the various alleged shortages with statements written thereon by the deputy finance commissioner in charge of the bank, setting out his information as to the misapplication, wrongful appropriation and embezzlement of these items, was attached as exhibit 2. This was verified by an affidavit of the deputy commissioner who prepared the same. Exhibit. 1, attached to the petition, set forth a copy of the form of application for the bond, showing the defendant's answers thereto, and the indemnity contract given by the defendant at the time he applied for the bond. The indemnity contract contained the following clause:

"And I further agree that all vouchers and other evidence of payment of any such loss, liability, costs, damages, charges or expenses of whatsoever nature incurred by the company or its attorneys shall be taken as conclusive evidence against me and my estate, of the fact and extent of my liability to the company."

The defendant filed a motion to make more definite and a motion to strike out, both of which were overruled. The defendant then answered and admitted the execution of the indemnity contract and that the plaintiff executed and delivered the bond as alleged. The defendant specifically denied that he had been guilty of any act of larceny, embezzlement, fraud, dishonesty, forgery, theft or wrongful misapplication of the funds of the American State Bank. He denied that exhibit 2 was a correctly itemized account, and alleged that the same was false and that the defendant was in no manner indebted to the plaintiff, or that he had become obligated to pay plaintiff any sum whatsoever by reason of any default on said bond. He alleged that he was without knowledge as to the receipt given by attorney Charles M. Blackmar, which plaintiff attached to its petition. He further denied that the vouchers or other evidence of payment were conclusive evidence or any evidence against him. The answer was verified by defendant.

After defendant had answered, plaintiff filed a motion for judgment on the pleadings. Upon the hearing of this motion defendant's attorneys in open court admitted that the receipt, attached to plaintiff's petition as exhibit 3, was genuine. Thereupon the court sustained the motion of plaintiff for judgment upon the pleadings and

entered judgment in favor of the plaintiff and against the defendant for the sum of $6,672.05 and interest thereon. The defendant has brought the matter to this court upon several assignments of error, the principal one being that the court erred in ordering judgment upon the pleadings.

Both parties to the suit admit that the case turns on the construction of the clause in the indemnity contract which is above set out, and further admit that the decisions of other states set forth two well-recognized lines of decisions on the construction of that clause in indemnity contracts. One line of authorities holds that such a clause in a contract is against public policy and, therefore, void. The other holds that it is not contrary to public policy but is reasonable and valid; that such an agreement is necessary to give a surety company the right which it should have under certain circumstances to make settlements; that the clause makes it possible for a surety company to avoid the necessity of litigating the question of its liability and thereby fosters quick settlements and avoids a multiplicity of suits. Both sides admit that this court has never decided upon the question of the validity of the "conclusive evidence" clause, *supra*.

However, in the case *Railway Company v. Simonson,* 64 Kan. 802, 68 Pac. 653, it was held:

"The provision of chapter 100 of the Laws of 1893 (Gen. Stat. 1901, §§ 5938-5947) which makes the specification of weights in bills of lading issued by railroad companies for hay, grain, etc., shipped over their lines, conclusive evidence of the correctness of such weights, is unconstitutional because denying to the companies due process of law, and because wrongfully depriving the courts of the judicial power to determine the weight and sufficiency of evidence." (Syl. ¶ 1.)

In the opinion, beginning at the bottom of page 807, the court said:

"A statute which declares what shall be taken as conclusive evidence of a fact is one which, of course, precludes investigation into the fact, and itself determines the matter in advance of all judicial inquiry. If such statutes can be upheld there is then little use for courts, and small room indeed for the exercise of their functions."

We will first examine the authorities cited by the appellee to sustain the judgment.

In the case of *Carroll v. National Surety Co.,* 24 F. (2d) 268, the clause relating to the voucher specified that "the voucher or vouchers or other evidence of such payment, settlement or compromise shall be *prima facie* evidence. . . ."

In *Illinois Surety Co. v. Maguire*, (Wis.) 145 N. W. 768, the contract provided that the fact and the amount of liability of the principal should be *"except for fraud* conclusively established against her by vouchers or other proper evidence showing payment of loss by the guaranty company."

In *Guarantee Co. of North America v. Pitts*, 30 So. 758, the clause read:

"Hereby admitting the voucher or other proper evidence of payment by said company of any such loss, damage or expense as conclusive evidence (except for fraud) against me and my estate of the fact and extent of my liability to said company."

In this case, at page 759, the court said:

"There is nothing wrong or unreasonable, or against public policy in this stipulation. Parties *sui juris* may lawfully make such stipulations and are bound by them. Under such contract the company was authorized in advance, as a condition of guaranteeing, to exercise discretion as to paying any demand made by the holder of the guarantee, and was bound only to act without fraud in settling a claim, and, thus paying, is entitled to hold the party guaranteed for reimbursement; and the voucher proves the claim, if not shown to have been infected with fraud."

In the case of *National Surety Co. v. Fulton*, 183 N. Y. Supp. 237, the clause there in question contained the language, "provided that such payment shall have been made by the company in good faith believing it was liable therefor."

In the above cases the wording of the "evidence clause," as we shall term it, was not exactly similar to the one in the instant case, and while they have a bearing upon the question they do not meet the exact contract here in issue.

The case of *American Bonding Co. of Baltimore v. Alcatraz C. Co.*, 202 Fed. 483, is exactly in point. The court in that case said:

"The provisions of the agreement to the effect that the vouchers and other evidences of loss should be conclusive upon the question of liability, were reasonable and valid. Such provisions in an indemnity agreement are obviously necessary to give a surety company the right which it should have under certain circumstances to make settlements, and are wholly unlike those executory agreements for arbitration which are sometimes rejected as ousting courts of their proper jurisdiction." (p. 485.)

We have read with great interest a discussion of the question here involved by Prof. John H. Wigmore, which is found in volume 16 of the Illinois Law Review, page 87. This scholarly writer goes into the question very thoroughly and discusses the decisions pro and con. The same discussion and treatment of the question is also to be

found in 1 Wigmore on Evidence, 2d ed., beginning at page 89. This author takes the position that the "conclusive evidence clause" should be upheld and disagrees very sharply with those courts which have held it invalid. In the volume last cited Wigmore says:

"It is enough for justice if the courts reserve the power to enforce observance of general state policies and to pass upon the freedom of a particular contract from fraud or coercion. This power is not impaired in the least by holding in general to be valid a contract fixing the parties' own mode of proof. The parties can always obtain a judicial ruling upon the conformity of the contract to general state policies and upon its consensual validity and there is no 'ouster of jurisdiction.'

"Under the inspiration of the jealous and outworn phrase that courts must not be 'ousted of their jurisdiction' many courts have shown a hostile attitude toward contract clauses altering or supplementing the orthodox rules of evidence. As long as that phrase reigns in the conventional thought of judges so long will they tend to include logically within the condemnation any consensual measure which assumes that a controversy of fact can justly be settled without employing all the technical network of rules of proof to a jury." (p. 107.)

While we have great admiration for Professor Wigmore and his wonderful work on evidence, yet in this instance we feel constrained to disagree with him.

Arnold on Suretyship and Guaranty, (1927) p. 367, says:

"Some courts have also held that an agreement between the principal and surety that the voucher of payment by the surety to the obligee shall be conclusive evidence against the principal as to the fact and extent of his liability, is void as against public policy. A person cannot waive the protection which the law affords. The surety cannot, by his *ex parte* acts, conclusively determine his own cause of action. The courts cannot have rules of law prescribed by acts of the parties. About an equal number of courts have held such an agreement to be valid, especially where there is no evidence of fraud by the indemnity company. The first view tends to prevent the possibility of collusion, justly prevents the alteration of rules of evidence by the act of the parties and protects the debtor who is frequently considered to be at the mercy of the creditor."

In Stearns on Suretyship, (1922) 3d ed., p. 421, it is said:

"Where it is stipulated that any voucher which may be issued to the surety for money paid in settlement of claims made upon the bond shall be conclusive of the amount due in an action for indemnity against the principal, the common-law right of indemnity is thereby enlarged, as the amount recoverable is no longer the amount due as shall be ascertained by judicial determination, but such sum as the surety may pay to the creditor, whether more or less than the sum due. Such a provision in the contract is void on the grounds of public policy."

The appellant cites the case of *Fidelity & Casualty Co. v. Eick-*

*hoff,* 63 Minn. 170, 30 L. R. A. 586, wherein the court said in discussing this question:

"The right of a party to waive the protection of the law is subject to the control of public policy which cannot be set aside or contravened by any arrangement or agreement of the parties, however expressed. Thus, an agreement to waive the defense of usury is void. So, also, according to the weight of authority is an agreement made at the time of contracting a debt to waive the prospective right of exemption. The agreement under consideration is more than a mere enlargement of contractual rights or the establishment of a rule of evidence. It provides that the plaintiff might by his own *ex parte* acts conclusively establish and determine the existence of his own cause of action. In short, he is made the supreme judge of his own case. . . . In the present case the attempt is to provide that, after the alleged cause of action has accrued, the plaintiff shall be the sole and conclusive judge of both its existence and extent. Such an agreement is clearly against public policy." (pp. 178, 179.)

The above case was followed in a later decision in Minnesota by *Fidelity & Casualty Co. v. Crays,* 76 Minn. 450, 79 N. W. 531; also, *Fidelity and Deposit Co. of Maryland v. Nordmarken,* (N. Dak.) 155 N. W. 669. In the case last cited the court in discussing the question said:

"Both the Eickhoff and Crays cases, *supra,* well illustrate the vice of what might happen under such provisions, these cases arising out of a shortage of weight between the grain purchased by a local elevator agent and the grain shipped out by the agent. The shortage might well have been due to inaccuracy in the scales or other innocent causes and yet the agent would be liable merely by a showing that the insurance company paid for the shortage under the terms of the policy and produced vouchers for such payment and settlement, if such provisions were held valid." (p. 670.)

In *Hannon v. United Workmen,* 99 Kan. 734, 163 Pac. 169, in discussing a by-law which attempted to abrogate the well-established rule of evidence relative to the unexplained disappearance of a person, and his absence for seven years, the court said:

"If it were to be given effect in the trial of an action brought upon the beneficiary certificate previously issued to such a member, it would amount to a declaration of a rule of evidence to be applied by the court to the determination of a question of fact—a regulation of the amount and character of evidence by which such fact might be determined. It is one of the functions of a court where the rights of the parties to a controversy turn upon a disputed matter of fact, to investigate and decide for the purpose of that case, the question at issue. . . . That the probability of correctness may be increased, rules of evidence which experience is thought to have shown to be salutary have been established. . . . We think such a regulation, as applied to existing certificates, is unreasonable, and therefore transcends the power of the association." (pp. 737, 738.)

While the above case relates to a different rule of evidence, still it shows the attitude this court has heretofore taken relative to the question here involved, namely, the right of parties to change the rules of evidence by their contracts. The court has previously held that parties cannot agree in the making of a mortgage that the equity of redemption shall be waived. In *Livestock Co. v. Trading Co.*, 87 Kan. 221, 123 Pac. 733, the court said:

"Considerations of public policy forbid the enforcement of a contract made by the borrower at the inception of his loan, that he will forfeit his interest in the property he offers as security if he fails to meet his obligation promptly; the same considerations apply with equal force where he makes a like contract upon a renewal of the loan or an extension of the time of its payment. To hold otherwise would be to deprive of the benefits of the rule those most in need of its protection. If at any time after the execution of a mortgage the mortgagee could by an extension of time or upon any other new consideration obtain from the mortgagor a valid agreement that if he did not pay the debt in full by a certain date he should forfeit the entire security, then virtually the ancient common-law mortgage would be still in vogue, its rigors unrelieved by any equity of redemption. The modern tendency is to extend rather than to contract the scope of equitable relief against forfeitures." (p. 227.)

Are contracts such as the one now before this court contrary to public policy? Public policy is a rather indefinite term and like fraud is incapable of being exactly defined. In 6 R. C. L. 707, it is said:

"An exact definition of public policy has never been given. The courts have, however, frequently approved Lord Brougham's definition of public policy as the principle which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare. This principle it has been said may be termed the policy of the law or public policy in relation to the administration of the law. Public policy is variable. The very reverse of that which is the policy of the public at one time may become public policy at another; hence no fixed rules can be given by which to determine what is public policy. The question what is public policy in a given case is as broad as a question of what is fraud in a given case and is addressed to the good common sense of the court."

In the same volume, 707, it is said:

"The question whether a contract is against public policy must be determined by its purpose and tendency and not by the fact that no harm in fact results from it."

In further discussing the question, the same work, 709, says:

"Constitutions and statutes are evidence of the general policy of the state; but when confronted with questions of general public policy as defined in the books, the courts go beyond express legislation and look to the whole body of the law—statutory, common and judicial decisions."

It is argued in support of contracts such as the one here under consideration, that parties who are *sui juris* should have a right to contract as they please; that if they choose to waive the rules of evidence which have been established for their benefit, they should have a right to do so. It is argued further that the contract affects no one except the immediate parties thereto; that no third party has any interest therein, and that the general public is not concerned therein.

It might well be contended that there is no interference with the freedom of contract, because when such an indemnity contract is presented to the party applying for a bond, if he did not wish to sign such a contract he could refuse to do so and could send for another bonding company which did not have such a clause in its contract, and that, therefore, such a contract should not be held invalid as being in conflict with public policy.

Is all this strictly true?

In the case we are considering it appears that the defendant was the president of the bank. No doubt the bank had a bookkeeper and other employees. It does not appear to have been a one-man institution. Assuming that there was a shortage, it might very easily have been due to the misconduct of the bookkeeper or some other employee. It is possible that defendant may never have taken a cent from the bank wrongfully. However, the adjuster for the bonding company decided that he had, and paid over the full amount of the bond. Now, under this "conclusive evidence" clause, if it is valid, even though defendant was perfectly innocent, he would be obliged to pay back to the surety company the full amount. it had paid out on embezzlements committed by some one else. Instead of having the judgment of a jury of twelve of his peers, the defendant is found guilty of embezzlement by one person—the adjuster. His contract then compels him to sacrifice his estate to the amount paid out by the surety company, notwithstanding he never took a cent.

But the courts which uphold such contracts say that is all right; that if he was foolish enough to make that kind of a contract he should abide by his bad bargain. Again it is argued that surety companies are not going to settle a claim without investigation and unless they are sure of liability. It is generally conceded that they have good resistance. But might they not make a mistake and settle under an erroneous belief of liability? Adjusters for surety

companies are not infallible. They have been known to make settlements under misapprehension as to liability.

As we view the matter, such contracts do affect the general public. Suppose that we should decree in this case that this contract is valid and that it should in all respects be upheld—then what would be the effect upon the public? It is manifest that immediately upon such a decision being rendered by this court, every surety company doing business in the state of Kansas would immediately place this "conclusive evidence" clause in its indemnity contract. This would mean that thousands of our citizens who are required to give fidelity bonds, contract and statutory bonds, would have no choice or alternative other than to sign the applications and indemnity contracts as submitted by the companies. Under such conditions, would there be freedom of contract?

Employees who are required to give fidelity bonds before entering upon their duties are not in position to bargain or quibble with surety companies upon the form of an indemnity contract required before a bond will be issued. They need the job. It is their means of livelihood. They will sign such contracts as a matter of expediency without regard to whether they meet with their approval or whether they are freely and willingly entering into the contract. Furthermore, it must be borne in mind that the average citizen who is giving a fidelity bond is not thoroughly educated in the law. The result is that when an indemnity contract, such as this one, is placed before him, he does not comprehend nor realize what he is signing. He does not know the rules of evidence. He does not know what beneficial rights he has under the rules of evidence which he waives by such contract. He does not have a full understanding of the rights which he is waiving. He signs the contract merely as the means to an end; namely, to get on the job and get his pay check started. It probably cannot be said that under such conditions, strictly speaking, the employee is compelled to sign the contract under coercion, such as would be recognized in the law as a ground for subsequently avoiding the contract. The learned Professor Wigmore argues that such a contract can always be avoided if any fraud or coercion is used in its inception, and that the courts are, therefore, not ousted from their jurisdiction by such contracts because the question of whether or not there has been a meeting of the minds, and a consent freely given, can always be litigated in the court. The trouble with that argument is that from a practical standpoint the employee really does not have any chance to exer-

cise his free will in the matter, and while the law would not recognize it as coercion, yet he is forced to sign such a contract in order to qualify for his job by giving the requisite bond. Of course, he could not come into court later on and set up such facts as showing coercion, and therefore the remedy suggested by Professor Wigmore, so far as its practicability is concerned, would be of no benefit to the employee. It would not be coercion because perchance the employee would be free to find other employment where a bond is not required, but if the employee is fitted only for employment in which a bond is required, then, in order to get that job he would virtually be coerced into signing an indemnity contract submitted by the bonding company. The same reasoning applies to contract and statutory bonds.

If we are going to throw down the bars and permit parties to make contracts such as they may see fit to make from time to time, which change the rules of evidence or entirely eliminate the rules of evidence so far as their individual contracts are concerned, will it not lead to the utmost confusion in the business affairs of the state? The rules of evidence now in force have been carefully worked out. They have not been set up by any one individual, but have been developed through the study and criticism of courts and lawyers and have been established by the statutes and judicial decisions throughout the past 700 years, since the adoption of the magna charta in 1215. In determining what should be the rules of evidence the courts and legislatures have been impelled by the consideration of the greatest good to the greatest number. These rules have been worked out with the purpose in mind of promoting the general welfare of the people. Since the experience of the past seven centuries has proven that these rules of evidence do promote the general welfare and are for the best interests of the people, then should we now say that we will leave it to the whim and caprice of each individual citizen as to whether he desires to be bound by the rules of evidence or not? We say, no.

To carry the point further, let us take up the rule established by the statute relative to testimony respecting a transaction or communication with a deceased person. (R. S. 60-2804.) The theory upon which this statute is based is that when death has sealed the lips of one party to a transaction, then, as a matter of protection to his heirs and personal representatives, and in order to prevent fraud and unfair dealing, the lips of the other party to the transaction shall likewise be sealed and he cannot testify to the matters

prohibited by the statute, under the conditions set forth therein. The courts have frequently commented upon the salutary effect of this rule. It is a bar against fraud and has perhaps proven more beneficial in its operation than any other single rule of evidence, unless perhaps it be the parol evidence rule.

If we uphold the "conclusive evidence" clause why should we not likewise uphold a contract made by parties in which they agree that in the event of the death of either party the other party should be competent to testify and that the disability provided by the statute should not apply? It may be said, in reply to this, that the rule laid down as to deceased persons is one fixed by a positive statute, and that a contract waiving the benefits of that statute would be held invalid; that it would be clearly against public policy because the contract would be clearly in conflict with the provisions of the statute, which is a legislative declaration of the policy of the state on that subject. Would such a contract be any different from the one now before us? If we should hold that parties may waive the benefit of established rules of evidence there would be no difference in principle in permitting them to waive the benefits of a rule established by statute as compared with a rule established by judicial decisions.

As to the argument that the "conclusive evidence" clause does not "oust the court of its jurisdiction," from a technical standpoint the argument is correct. As pointed out by Professor Wigmore, it does leave the court the right to determine the consensual validity of the contract and therefore does not, strictly speaking, oust the court of its jurisdiction. However, it pares down the functions of the court. It makes the court merely a ministerial officer of the parties. There is nothing left for the court to do but to enter judgment upon the contract, just as the court in the instant case did; that is a mere ministerial act and the court becomes simply an automaton to do the thing which the parties agree shall be done. This is not within the spirit of either the federal or state constitutions. Courts were established, under our constitutions, for the purpose of interpreting, administering and applying the laws; to exercise judicial discretion and to do justice between all citizens. In performing these duties, courts are guided by the established rules of evidence. It was never the intention of the makers of our constitutions that the courts should become mere ministerial officers. And so, while technically such contracts would not literally "oust" the courts

of their jurisdiction, yet they would take away the functions and duties of courts and be violative of the spirit of our constitutions.

Professor Wigmore, in his article herein referred to, chides the courts which do not uphold contracts such as the one now before the court, and says that in refusing to hold them valid the courts are wrong. In volume 1, p. 106, he says:

"This obstructiveness of courts to simple and expeditious extra-judicial settlements is unwise and unsuited to the times. Courts may as well realize that there are for many purposes other and more satisfactory modes of inquiry and determination of fact than their own."

This court likes to be considered progressive but not to the extent that we are going to set aside the established order of things to engage in experiment. We choose to look before we leap. Kansas has (as a state, and seven years as a territory) gotten along for seventy-six years without such contracts, and during that period she and her citizens have prospered exceedingly well. We are not aware that her growth, her progress and the welfare of her citizens demand that individuals shall be permitted to contract as they see fit with reference to the rules of evidence.

The appellant asks the court to indicate what ruling should be made upon the motion to make more definite and the motion to strike, filed by the appellant in this case. We believe that our decision upon the main question herein will enable the trial court to properly pass upon these motions. They, of course, should be refiled and reconsidered in connection with the decision of this court upon the clause of the contract in question. Without going into detail on these motions, we would suggest that the court should strike out in exhibit 2, and from the verification attached thereto, such statements as set forth conclusions to the effect that the defendant misappropriated and embezzled the funds of the bank which would, of course, be prejudicial to the jury upon a trial of this action.

We hold that the "conclusive evidence" clause is invalid on the ground that it is contrary to the public policy of this state. The judgment is reversed and the cause remanded to the district court for a new trial in accordance with this decision.