## Fidelity & Deposit Co. of Maryland v. John K. Wu and Carol H. Wu

[552 A.2d 1196]

No. 85-297

Present: **Allen, C.J., Peck and Dooley, JJ., and Barney, C.J. (Ret.), Specially Assigned**

Opinion Filed July 22, 1988

*Allan R. Keyes* and *Mark H. Kolter* of *Ryan Smith & Carbine, Ltd.,* Rutland, for Plaintiff-Appellee.

*Paul S. Kulig* of *Keyser, Crowley, Banse & Facey*, Rutland, for Defendants-Appellants.

**Dooley J.,** This is an appeal by defendants, John K. Wu and his wife Carol Wu, from a directed verdict rendered by the Windsor Superior Court at the close of a jury trial. The judgment was for $35,302 in damages resulting from payment on a performance bond by Fidelity & Deposit Company of Maryland, a surety and bonding company doing business in this state, following the defendants' breach of a subcontract to perform construction work on a dam project near Goshen, New Hampshire. The plaintiff also was awarded consultant and attorney fees, and other expenses and costs totaling $7,959.59, plus interest on both amounts. We affirm.

The facts, as agreed to by the parties, are as follows: Defendants executed a subcontract performance bond in the amount of $76,320 with the plaintiff following a successful bid in the same amount to perform certain construction work on the Sugar River Watershed Dam Project near Goshen, New Hampshire. The bond agreement named the Atom Contracting Corporation, the general contractor for the project, as obligee - should the defendants default on their subcontract. Plaintiff also served as surety for Atom on its $1.6 million performance bond with the United States Soil Conservation Service for completion of the entire project.

Under the terms of the subcontract, defendants were to complete eight items on the project. The major item, No. 15, called for the defendants to provide labor and materials to pour 178.3 cubic yards of reinforced concrete at a unit cost of $285 per cubic yard at a total cost to the Soil Conservation Service through Atom of $50,815. Defendants began work on their subcontract, which was the core of the entire dam project, in the late spring of 1981. Subsequent delays, caused by the failure of Atom to properly prepare the dam site for subcontract work, resulted in the defendants being able to pour only 133.4 cubic yards of reinforced concrete before winter forced the closure of the project. Defendants had received from Atom approximately $39,000 on account from the Soil Conservation Service for the work performed on the subcontract at the time the site was closed for the winter.

In the spring of 1982, John Wu accepted a job in Washington, D.C., and notified Atom Construction that his firm would not complete the subcontract. Atom served notice on plaintiff, Fidel-

ity & Deposit Company of Maryland, that it would file a claim on the performance bond.[1]

Exercising its option under the indemnity agreement, plaintiff assigned performance of the subcontract to Atom. In July, representatives of plaintiff, defendants, and Atom toured the construction site. At that point, Atom's project superintendent estimated that the cost of completing the subcontract would be approximately $10,000 over the original bid. Approximately one month later, Atom submitted a bill detailing excess costs, above the original bid, of $37,673. Plaintiff notified defendants' attorney of the bill and requested a meeting with Mr. Wu, expressing concern that "further delay by him could result in litigation." Apparently, there was a response to this letter and a follow-up conversation but the content of neither was in evidence. Two weeks later, plaintiff again wrote requesting defendants' position and offering to meet, if necessary, with Mr. Wu in Washington, D.C. There is no indication of a response to this letter.

When the final bill arrived, it exceeded the subcontract price by $50,614. Plaintiff again requested a meeting by letter and also hired a consulting engineering firm to verify Atom's costs and determine whether the price was fair and reasonable. Approximately one month later, the engineer reported that Atom should be paid only $37,302 because that was the "apparent maximum value" to which they were entitled. The engineer attributed the overbilling by Atom to a clerical error and an error in judgment in the field in allocating costs. The report was sent to defendants with a statement that defendants' attorney had refused to return telephone calls about it and that the Atom bill would be paid unless defendants posted a bond.[2] The bill was in fact paid the same day that the letter was sent.

Plaintiff brought this action under a provision of the surety agreement whereby defendants agreed to indemnify and hold harmless the plaintiff for any and all liability incurred by the plaintiff as a result of the failure of the subcontractor to perform. The provision states:

---

[1] Defendants also had executed a materialman's bond which was claimed against for the supply of materials but which is not in dispute as to liability or damages.

[2] Defendants have made no claim that the bond requirement was unauthorized. The thirteenth section of the indemnity agreement appears to authorize such a requirement. In any event, the matter immediately became moot because plaintiff paid Atom on the same day that it sent the letter to defendant.

> In the event of any payment by the Surety the Contractor and Indemnitors further agree that in any accounting between the Surety and the . . . Indemnitors . . ., the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be *prima facie* evidence of the fact and amount of the liability to the Surety.

Defendants resisted the claim asserting that the payments to Atom were not made in good faith.

The case was tried before a jury, but based on the evidence outlined above the trial court granted a directed verdict for plaintiff. It ruled that once plaintiff introduced evidence as to a good faith payment, and the amount of that payment, the surety agreement established a presumption of defendants' liability and the amount of damages. The court further ruled that it was up to defendants to then attack and overcome this presumption by presenting evidence sufficient to support a jury finding that there was a lack of good faith. It found that defendants failed to rebut the presumption and accordingly entered judgment for plaintiff. In this appeal, defendants claim that there was sufficient evidence to get to the jury on the question of whether plaintiff acted in good faith. They also allege that the trial court committed error in excluding evidence of the amount that Atom paid plaintiff for a surety bond covering its liability on the contract.

At the outset, we note that it makes little difference whether or not the presumption exists in this case. As the trial court found, the prima facie evidence language in the last clause of the agreement creates a presumption. See 9 Wigmore on Evidence § 2494, at 379 (Chadbourn rev. 1981) (use of term prima facie evidence in this context is equivalent to presumption). Such a presumption imposes on the party against whom it operates the burden of producing evidence sufficient to defeat the presumed fact. *Id.;* see also V.R.E. 301(a). In short, defendants needed to put in sufficient evidence to get to the jury on the issue of good faith. However, even if there were no presumption, defendants would have

had the same burden. See, e.g., McCormick on Evidence § 338 (3d ed. 1984) (burden of production shifts to adversary once proponent has satisfied his or her initial burden of going forward).[3] Plaintiff put on extensive evidence to show it acted in good faith. See *id.* § 338, at 955. To avoid the directed verdict, defendants had to put on "sufficient evidence reasonably tending" to support their claims. Cf. *Roberts* v. *State,* 147 Vt. 160, 163, 514 A.2d 694, 695 (1986). Thus, in the posture of this case, defendants' duty with or without the presumption was the same.

We recognize that the burden question is somewhat confused by this Court's decision in *Insurance Co. of North America* v. *Tucker,* 128 Vt. 340, 262 A.2d 489 (1969), a case in which plaintiff also sought recovery based on the indemnity provision of a surety bond. In *Tucker,* the plaintiff surety company was sued by a creditor of the defendant and paid the judgment obtained by the creditor. The plaintiff sued for the money paid to the creditor, and the defendant alleged that the money was paid in bad faith. The trial court prohibited the defense. This Court reversed, holding in dicta that: "[t]he burden was on the defendant to establish the bad faith that he alleged in the answer was exercised by the insurance company." 128 Vt. at 344, 262 A.2d at 492. *Tucker* is distinguishable from this case because, there, the surety paid off a judgment so the burden fairly shifted to defendant to go forward and show that plaintiff acted in bad faith in incurring and paying the judgment. Here, there was no judgment. Plaintiff responded only to a billing from Atom. Plaintiff retained the burden of proof on the elements of liability including good faith.

Defendants argue that they met their burden by the following evidence: (a) plaintiff failed to hire an independent, professional consultant in June when the consultant could have monitored the overruns as they occurred; (b) the price charged by Atom was excessive; (c) plaintiff paid Atom's claim too quickly on receiving the consultant's report even though plaintiff's claims attorney did not fully understand the report; and (d) the consultant's report was flawed. In essence, their brief contains the argument they would have made to the jury if they had been allowed to get to the jury. In addition, they claim that the erroneous exclusion of

[3] It is the burden of production that shifts — not the ultimate burden of persuasion. The burden of persuasion remains with the proponent. See, e.g., McCormick on Evidence § 336. In this case, the burden of persuasion on the issue of good faith was on the plaintiff.

the evidence of the premium paid by Atom to plaintiff cut off an examination of the extent of the conflict of interest plaintiff faced in reducing payments to a company (Atom) whose work it also had insured.

While we have no precedent that precisely establishes the standard of good faith in cases like this, the decisions from other states suggest a relatively easy standard for plaintiff to meet. Thus, in *Ford* v. *Atena Insurance Co.*, 394 S.W.2d 693, 698 (Tex. Civ. App. 1965), the court stated:

> [L]ack of diligence or negligence is not the equivalent of bad faith; . . . even gross negligence is not the same as bad faith, but may be evidence tending to show it. . . . wilful ignorance is the equivalent of bad faith, and bad faith may be shown by a wilful disregard of and refusal to learn the facts when available and at hand.

(Citation omitted). See also *United States Fidelity & Guaranty Co.* v. *Napier Electric & Constr. Co.*, 571 S.W.2d 644, 646 (Ky. App. 1978) (indemnitor must show lack of good faith); *Engbrock* v. *Federal Ins. Co.*, 370 F.2d 784, 787 (5th Cir. 1967) ("neither lack of diligence nor negligence is the equivalent of bad faith; . . . improper motive . . . is an essential element of bad faith.").[4]

We have examined the concept of good faith in the context of a liability insurer's duty to settle a claim within policy limits. See *Myers* v. *Ambassador Ins. Co.*, 146 Vt. 552, 508 A.2d 689 (1986). While the standard of good faith may be different for an insurer in such circumstances because of the unique conflicts of interest it faces, *Tucker* does teach that "[a] surety contract in this state is regarded more in the nature of an insurance contract [so that] by analogy the rules governing liability in that class of contracts is applied." 128 Vt. at 342, 262 A.2d at 490. In *Myers,* this Court defined the standard of good faith as follows:

> The insurer's fiduciary duty to act in good faith when handling a claim against the insured obligates it to take the insured's interests into account, The company must diligently investigate the facts and the risks involved in the claim, and should rely only upon persons reasonably qualified to make such an assessment. If demand for settlement

---

[4] The decisions tend to use the terms "bad faith" and "lack of good faith" interchangeably. We have adopted that practice in this opinion.

is made, the insurer must honestly assess its validity based on a determination of the risks involved. . . . In addition . . . , the insurer must fully inform the insured of the results of its assessment of the risks, including any potential excess liability, and convey any demands for settlement which have been made.

146 Vt. at 556, 508 A.2d at 691 (footnote and citations omitted).

■ Defendants failed to raise a jury question on good faith under the standards imposed in the indemnity cases from other jurisdictions, such as *Ford* v. *Aetna Insurance Co.,* 394 S.W.2d 693. Plaintiff's conduct appears to comply even with the *Myers* standard although that standard imposes a higher duty on plaintiff than is necessary in surety indemnity cases. Here, plaintiff's attorney continually informed defendants of what was occurring to discharge their liability under the subcontract and received neither objections nor cooperation in reducing the claims. Plaintiff hired an expert when it became obvious that there would be substantial overruns, and the expert substantially reduced the amount paid to Atom. Plaintiff followed the advice of the expert. There was a relatively small calculation error in the consultant's report, but this fails to demonstrate general flaws in the report. There is no independent evidence that the consultant followed an improper methodology in analyzing Atom's claims. At best, the jury could draw the conclusion that plaintiff was negligent in analyzing Atom's bills — there was no evidence of lack of good faith for the jury.

In general, defendants have attempted to attack this factual record by raising doubts, usually by cross-examination of plaintiff's witnesses, that plaintiff in all respects followed the proper course. Thus, defendants point out that plaintiff might have hired a consultant earlier or might have questioned the consultant more carefully. Unfortunately, defendants misperceive the issue. Even if the doubts raised would have been sufficient to get to the jury on a negligence question, none could support a finding of lack of good faith.

■ There remains only the contention that the trial court improperly excluded evidence of the amount that Atom paid plaintiff to secure its surety bond. Defendants' theory was that plaintiff had a conflict of interest because Atom paid a much higher premium for its bond than Wu Associates paid for its bond. Thus,

defendants urge that plaintiff had an interest in favoring Atom over them in paying the Atom claims.

As defendants argue, the evidence met the relevancy test of V.R.E. 401, although the theories of conflict of interest were weak. There are, however, two hurdles that defendants must get over before the exclusion will lead to a reversal. First, the trial court could exclude the evidence if it found that the " 'probative value is outweighed by dangers of prejudice, confusion, or delay' " — and it has substantial discretion in applying this balancing test. *State* v. *Dorn,* 145 Vt. 606, 616, 496 A.2d 451, 456 (1985) (quoting Reporter's Notes, V.R.E. 403). The weakness of defendants' theory made this evidence marginally relevant, and the trial court could find that defendants were trying to lead the jury far astray from the basic issues in the case. Thus, the court was well within its discretion to exclude the evidence under V.R.E. 403.

Second, defendants must establish prejudice in this case where the plaintiff obtained a directed verdict. We believe that the answer to the proffered question could not have changed the ruling on the directed verdict. Thus, the exclusion was harmless.

*Affirmed.*