(910 P.2d 872)
No. 72,511
THE HARTFORD, *Appellant,* v. DONALD F. TANNER, *Appellee.*

Opinion filed February 9, 1996.

*James E. Switzer* and *Scott C. Long,* of Payne & Jones, Chartered, of Overland Park, for appellant.

*Lawrence L. Ferree, III,* and *G. Peter Bunn, III,* of Ferree, Bunn & O'Grady, Chtd., of Overland Park, for appellee.

Before GERNON, P.J., MARQUARDT, J., and JAMES W. PADDOCK, District Judge Retired, assigned.

MARQUARDT, J.: The Hartford (Hartford) seeks indemnification, as a surety, from Donald F. Tanner on two bond contracts Tanner signed as an indemnitor. After a trial to the district court, the district court ruled that Hartford's payments on the bonds were not reasonable and, therefore, Hartford was not entitled to indemnification from Tanner. Hartford appeals both the use of the "reasonableness" legal standard and the application of that standard.

Tanner and Ronald Brock were partners who imported "gray market" motor vehicles that required conversion to bring them into compliance with standards set by the Environmental Protection Agency (EPA) (19 C.F.R. § 12.73 [1995]) and the Department of Transportation (DOT) (19 C.F.R. § 12.80 [1995]; see 19 C.F.R. § 113.11 [1995]). Federal regulations require that importers obtain a surety bond from the United States Customs Service (Customs) to ensure that the conversions are made.

To obtain a Customs bond from Hartford, an applicant must sign Hartford's printed application form. Brock and Tanner signed such forms for the issuance of three bonds. Hartford then issued bond No. 4474858 on October 20, 1981, for $68,000, bond No. 4474859 on November 2, 1981, for $27,000, and bond No. 4474873 on November 10, 1981, for $7,000.

Hartford asserts that the obligations of the parties are controlled by their printed application form and that Hartford's good faith

should be controlled by the language of the form only. The form contains broad indemnity provisions in Hartford's favor. It states, *inter alia*:

"SECOND: That the undersigned [principal and indemnitor] will at all times indemnify and keep indemnified the Surety, and hold and save it harmless from and against any and all liability for damages, loss, costs, charges and expenses of whatsoever kind or nature (including counsel and attorney's fees) which the Surety shall or may, at any time sustain or incur by reason or in consequence of having executed the bond or other instrument herein applied for, or any and all other bonds or other instruments executed for or at the instance and request of the undersigned; and will pay over, reimburse, and make good to the Surety, its successors, and assigns, all sums and amounts of money which the Surety, or its representatives shall pay, or cause to be paid, or become liable to pay, by reason of the execution of any such instruments, or in connection with any litigation, investigation, or other matters connected therewith, such payment to be made to the Surety as soon as it shall have become liable therefore, whether Surety shall have paid out such sum, or any part thereof, or not. That in any accounting which may be had between the undersigned and the Surety, the Surety shall be entitled to credit for any and all disbursements in and about the matters herein contemplated, made by it in good faith under the belief that it is or was liable for the amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether such liability, necessity, or expediency existed or not.

. . . .

"ELEVENTH: That the Surety shall have the exclusive right for itself, and for the principal on or in said bond or other instrument, to decide and determine whether any claim, demand, liability, suit, action, judgment or adjudication, made, brought, or entered against the Surety or principal on or in said bond or other instrument, or both, whether jointly or severally, or jointly and severally, shall, or shall not, be defended, tried, appealed, or settled, and its decision shall be final, conclusive and binding upon the undersigned."

Brock imported four Mercedes-Benz automobiles. Tanner paid Exclusively Mercedes (Peter Scarpias) to bring these vehicles into compliance with federal regulations. There is no evidence that the conversion work was completed; however, Scarpias led Tanner to believe that all of the conversion work had been completed and that the documentation to prove his work had been submitted to both the EPA and DOT. No documentation on the completed work was ever sent to Tanner or Customs.

In December 1981, the vehicles were delivered to a used car dealership, Mercedes Unlimited. The owners of Mercedes Unlim-

ited stole the vehicles, were subsequently charged with theft, and pled guilty on June 8, 1983.

Customs demanded payment of $6,511.11 on bond No. 4474873, and on May 2, 1984, Hartford paid Customs' demand.

Various notices of "penalty or liquidated damages" and letters were sent to Brock and Hartford over a period of 4 years on bond No. 4474858. Two of the letters stated:

"As surety, you are entitled to the same relief which would have been afforded the principal. Further relief will be granted upon receipt of proof that the vehicle was modified to conform to EPA and/or DOT standards and was not sold prior to this release by those agencies."

The two notices stated:

"If you feel there are extenuating circumstances, you have the right to object to the above action. Your petition should explain why you should not be penalized for the cited violation. Write the petition as a letter or in legal form; submit in (triplicate); addressed to the Commissioner of Customs, and forward to the District Director of Customs at 300 S. Ferry St., Terminal Island, Ca. 90731 Attn: F, P&F. (213) 548-2448. Unless the amount herein demanded is paid or a petition for relief is filed with the District Director of Customs within 60 days from the date hereof, further action will be taken in connection with your bond or the matter will be referred to the United States Attorney."

Jeffrey Hodges, Hartford's attorney, acknowledged that Hartford had received notices from Customs on bond No. 4474858. Hodges testified that these notices are routinely sent by Customs but he would not take any action unless there were "large amounts being demanded, or numerous ones coming in. Really depends on the situation."

The first contact Hodges had with Tanner was around November 8, 1983. In a telephone conversation, Tanner informed Hodges that five of the vehicles had been stolen and that the thieves had been convicted. Tanner's attorney, John Skoog, wrote Customs a letter on October 22, 1984, protesting its $58,365 claim. A copy of this letter was sent to Brock and Hartford.

Skoog testified that after February 10, 1986, he had a phone conversation with Hodges. Skoog told Hodges that the "notices are generated automatically by the Customs Department as long as a protest is on file. There's no effect, they don't need to be honored."

Skoog further informed Hodges that adjudication of the $58,365 claim was on hold and they would not have an answer on the claim for about 18 months.

Hodges never indicated to Skoog or Tanner that Hartford intended to pay either of the liquidated damage assessments.

On April 15, 1986, Hartford received one of many demands from Customs for payment of the $58,365. On April 16, 1986, Hartford, without any further contact with Skoog or Tanner or any further investigation, paid the $58,365.

Susan Kohn Ross, an attorney specializing in customs, testified that Skoog's letter was sufficient to start the mitigation procedure with Customs. Ross also testified that because of the backlog of about 9,000 cases at Customs at that time, cases were routinely mitigated for cents on the dollar.

About the same time as the two bonds in question in this case were being disputed, Customs made a demand on Hartford for payment on a $27,000 bond on which Tanner was indemnitor. Hartford petitioned Customs for release from its obligation on this bond. Hartford was never required to pay anything on this bond.

On December 8, 1986, Hartford sued Tanner as indemnitor for the amounts it had paid Customs on the two bonds.

The district court entered summary judgment in favor of Tanner, holding that Hartford's "decision to pay the bond claims without attempting to mitigate by use of the administrative appeals process provided by the United States Customs Service was in violation of its duty of good faith and fair dealing under its agreement with defendant."

Hartford appealed. This court reversed and remanded for a factual determination of the reasonableness of the payments made by Hartford. *Hartford v. Tanner*, No. 64,995, unpublished opinion filed November 2, 1990. Following a trial to the district court, the court ruled that Hartford's payments on the bonds were not reasonable and, therefore, Hartford was not entitled to indemnification from Tanner. Hartford appeals.

Hartford argues that the district court ignored the language of the contract (Hartford's bond application form) and imposed a stricter good faith and reasonableness standard on Hartford. Tan-

ner responds that this court's previous order held that the duty of good faith and fair dealing is implied.

## Standard of Review

The parties have characterized the bond application as a contract. Hartford correctly notes that when construing a contract this court has unlimited review. See *Spivey v. Safeco Ins. Co.*, 254 Kan. 237, 240, 865 P.2d 182 (1993). The construction of a written instrument is a question of law. *Akandas, Inc. v. Klippel*, 250 Kan. 458, 464, 827 P.2d 37 (1992). "Thus, irrespective of the district court's construction, 'on appeal a contract may be construed and its legal effect determined by the appellate court.' [Citation omitted.]" *Kansas Baptist Convention v. Mesa Operating Limited Partnership*, 253 Kan. 717, 724, 864 P.2d 204 (1993). However, a determination of good faith conduct is a question of fact properly decided by the trial court. See *Shelton v. Union Bankers Ins. Co.*, 853 S.W.2d 589, 593-94 (Tex. App. 1993) (remanding question of breach of good faith because the jury failed to answer the question).

In *J. F. White Engineering Corp. v. General Ins. Co. of America*, 351 F.2d 231, 233 (10th Cir. 1965), the court evaluated the reasonableness of a bonding company's decision to allow the contractor to complete the project. The court held that "the issue of reasonableness in circumstances like these is usually for the trier of the facts. [Citation omitted.]" 351 F.2d at 233.

In this case, the determination of the correct standard of good faith under the indemnity agreement is a question of law subject to de novo review. See *Baptist*, 253 Kan. at 724. The factual determination of whether and to what extent the good faith standard was met, addressed in the second issue, is reviewed to determine whether the district court's findings of facts " 'are supported by substantial competent evidence and whether they are sufficient to support the trial court's conclusions of law.' " *Levier v. Koppenheffer*, 19 Kan. App. 2d 971, 979, 879 P.2d 40, *rev. denied* 255 Kan. 1002 (1994) (quoting *Scott v. State Farm Mut. Auto Ins. Co.*, 18 Kan. App. 2d 93, Syl. ¶ 1, 850 P.2d 262 [1992]).

## Suretyship

### The general principles of suretyship are:

"A surety is [defined as] one who becomes responsible for the debt, default or miscarriage of another; but in a narrower sense, a surety is a person who binds himself for the payment of a sum of money, or for the performance of something else, for another who is already bound for such payment or performance." *SNML Corp. v. Bank*, 41 N.C. App. 28, 36, 254 S.E.2d 274 (1979).

"Every suretyship involves three parties: (a) the one for whose account the contract is made, whose debt or default is the subject of the transaction, and who is called the principal; (b) the one to whom the debt or obligation runs, the obligee in suretyship, called the creditor; and (c) the one who agrees that the debt or obligation running from the principal to the creditor shall be performed, and who undertakes on his own part to perform it if the principal does not, called the surety." Stearns, Law of Suretyship § 1.4 (5th ed. 1951).

" 'The relation of suretyship grows out of the assumption of a liability at the request of another, and for his benefit.' 74 Am. Jur. 2d, Suretyship § 7." *Nicklin v. Harper*, 18 Kan. App. 2d 760, 767, 860 P.2d 31, *rev. denied* 253 Kan. 860 (1993).

" 'One of the generally recognized functions of a surety is to save the creditor from the inconvenience and delay of enforced collection from the principal.' Simpson on Suretyship § 51, p. 263 (1950)." *Nicklin*, 18 Kan. App. 2d at 767. The surety's liability is direct, and the surety contracts to perform the principal's obligation. Hinchey, *Surety's Performance Over Protest of Principal: Considerations and Risks*, 22 Tort & Ins. L.J. 133, 134 (1986). This direct liability to perform the principal's contract distinguishes a surety from a guarantor in that a guarantor answers only for the consequences of the defaults of the principal. *Bomud Co. v. Yockey Oil Co.*, 180 Kan. 109, 115, 299 P.2d 72 (1956); see Stearns, Law of Suretyship §§ 1.1, 1.5 (5th ed. 1951).

### The Implied Duty of Good Faith and Fair Dealing

Good faith is typically implied in indemnity (surety) contracts. "Because of the potential for abuse by sureties, the [general indemnity agreement] will typically provide, or the court will imply as a condition of recovery, that the surety act reasonably or in good faith." *Surety's Performance*, 22 Tort & Ins. L.J. at 143 (citing *Fidelity & Dep. Co. of Maryland v. Bristol Steel*, 722 F.2d 1160, 1163

[4th Cir. 1983]; *Commercial Union Ins. Co. v. Melikyan*, 430 So. 2d 1217, 1221 [La. App. 1983]).

Additionally, Kansas courts imply a duty of good faith and fair dealing in every contract. *Baptist*, 253 Kan. at 724-26. The *Baptist* court noted that " 'if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee.' " 253 Kan. at 725 (quoting 17A Am. Jur. 2d, Contracts § 380). Employment-at-will contracts are the only exception to the good faith obligation currently recognized in Kansas. *Baptist*, 253 Kan. at 726; see *Morriss v. Coleman Co.*, 241 Kan. 501, 514-15, 518, 738 P.2d 841 (1987).

Hartford argues that an obligation of good faith should not be implied because good faith is stated as a condition in the bond application, and the application should control the rights and responsibilities of the parties. However, the only place that good faith is mentioned in the application is in paragraph "Second," where it refers to payment. The remainder of the document gives total discretion to Hartford in making all decisions relative to claims and payment. The obligation of good faith and fair dealing on the part of the surety is implied and in a sense superimposed on the entire surety contract.

## Good Faith Standard: Reasonableness

The issue then becomes what good faith standard should be used to determine the implied obligation of a surety seeking to enforce an indemnity agreement.

Hartford cites paragraph "Eleventh" as giving Hartford the exclusive right to make decisions regarding demands and that Hartford's decision "shall be final, conclusive and binding" on Tanner.

"American courts have traditionally taken the view that competent adults may make contracts on their own terms, provided they are neither illegal nor contrary to public policy, and that in the absence of fraud, mistake or duress a party who has fairly and voluntarily entered into such a contract is bound thereby, notwithstanding it was unwise or disadvantageous to him. [Citation omitted]. Gradually, however, this principle of freedom of contract has been qualified by the courts as they were confronted by contracts so one-sided that no fair minded person would view them as just or tolerable." *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 757, 549 P.2d 903 (1976).

Kansas follows the traditional rule that parties who are mentally competent may contract on their own terms unless the contract is illegal, contrary to public policy, or obtained by fraud, mistake, overreaching, or duress. *Corral v. Rollins Protective Services Co.*, 240 Kan. 678, 681, 732 P.2d 1260 (1987). "A party who has entered into a contract is bound by it even though the contract may prove to be unwise or disadvantageous to him. [Citation omitted.]" *Jarvis v. Jarvis*, 12 Kan. App. 2d 799, 800, 758 P.2d 244 (1988) (holding that an agreement that limits the freedom of a party to choose an attorney is void and unenforceable as against public policy).

On a statutory mechanic's lien bond, the court held "[t]he right of the surety company to be reimbursed for any money it has to pay out by reason of its having executed the bond as surety necessarily depends upon the terms of any agreement by which some one agreed to indemnify it for such loss, or to be the principal on such bond." *Lindenberger v. Zweifel*, 124 Kan. 737, 741, 262 Pac. 538 (1928) (holding that a surety could not obtain a judgment against the indemnitor's spouse because the surety did not have a contract with the spouse).

An exception to the freedom of contract principle has been recognized when a contract is so one-sided that it is found to be unconscionable. *Corral*, 240 Kan. at 681-82.

Where a contract is so one-sided that no fair-minded person would view it as just or tolerable, it is deemed unconscionable. Where a party uses a printed form or boilerplate contract which is skillfully drawn by the party in the strongest economic position, which establishes industry-wide standards offered on a take it or leave it basis to the party in a weaker economic position, the contract is unconscionable. See *Wille*, 219 Kan. at 758-59.

There is no published Kansas case addressing what the implied obligation of good faith requires of a surety seeking to enforce an indemnity agreement.

Cases from other jurisdictions suggest that the principal and surety relationship is one of debtor and creditor. See, *e.g.*, *Howard Johnson, Inc. of Florida v. Tucker*, 157 F.2d 959, 962 (5th Cir. 1946). "The nature of an indemnitor's liability under an indemnity contract shall be determined by the provisions of the indemnity

agreement itself." *U.S. Fidelity & Guar. Co. v. Napier Elec.*, 571 S.W.2d 644, 646 (Ky. App. 1978); see *Engbrock v. Federal Insurance Company*, 370 F.2d 784, 786 (5th Cir. 1967) (interpreting Texas law); see also *Commercial Union Ins. Co.*, 430 So. 2d at 1221 (distinguishing between surety contract and indemnity contract and noting that "[t]he contract of indemnity forms the law between the parties and must be interpreted according to its own terms and conditions").

While an indemnification agreement is to be interpreted according to its terms, as noted above, an obligation of good faith is universally implied in those terms. See *Fidelity*, 722 F.2d at 1163-64; *Surety's Performance*, 22 Tort & Ins. L.J. at 143. Jurisdictions disagree, however, as to what the good faith obligation requires of a surety seeking indemnification.

Some jurisdictions hold that the implied duty of good faith requires only an absence of fraud by the surety. See *Surety's Performance*, 22 Tort & Ins. L.J. at 148-49. An "indemnitor may successfully attack payments made by the surety only by pleading and proving fraud *or* lack of good faith by the surety." (Emphasis added.) *Napier*, 571 S.W.2d at 646.

Construing an indemnity provision, a Texas court held: " '[W]e are confronted with the well-nigh inescapable conclusion that the parties to this bond [indemnity agreement] have lodged in the indemnitee a discretion limited only by the bounds of fraud.' " *Hess v. American States Ins. Co.*, 589 S.W.2d 548, 551 (Tex. Civ. App. 1979) (quoting *Central Surety & Insurance Corporation v. Martin*, 224 S.W. 2d 773, 776 [Tex. Civ. App. 1949]). The contract in *Hess*, however, had a prima facie evidence clause. See 589 S.W.2d at 550; *Fidelity and Deposit Co. v. Davis*, 129 Kan. 790, 801, 284 Pac. 430 (1930).

In *Davis*, the court held that a "conclusive evidence" clause in an indemnification contract given by a principal to a surety was invalid because it violated public policy by making the court ministerial. The court noted that the clause left the court nothing to do but enter judgment in favor of the surety. 129 Kan. at 800-01.

The *Davis* case represents an historical reluctance to allow indemnitors to bargain away rights. It is also worth noting that many

of the cases adopting the fraud standard in good faith determinations involve the interpretation of contracts containing prima facie or conclusive evidence clauses. See, *e.g., Napier,* 571 S.W.2d at 646; *Hess,* 589 S.W.2d at 550; *Fidelity & Deposit Co. v. Wu,* 150 Vt. 225, 228, 552 A.2d 1196 (1988).

The language in paragraph 11 of Hartford's application, along with the language in the remainder of the document, gives Hartford total discretion in handling claims. Hartford's actions are "final, conclusive and binding" on the principal and indemnitor. Such contract provisions hold Hartford to no standard other than its own expediency. This court's previous opinion in this case held that "[p]aragraph 11 of the present agreement has the same effect as a 'conclusive evidence' clause." We hold that this language is contrary to public policy.

In the insurance context, in handling a claim for damages in excess of policy limits, "the insurer must conduct itself with the same degree of care which would be used by an ordinarily prudent person in the management of his or her own business affairs. [Citation omitted.]" *Levier,* 19 Kan. App. 2d at 979. Once an insurer steps into the negotiations between its insured and a claimant, the insurer may be liable for negligence in defending or settling the action. *Levier,* 19 Kan. App. 2d at 975.

Under Kansas law, certain surety bonds, such as banker's blanket bonds, are held to create an insurance relationship. *First Hays Banshares, Inc. v. Kansas Bankers Surety Co.,* 244 Kan. 576, 580, 769 P.2d 1184 (1989); see *Docking v. National Surety Co.,* 122 Kan. 235, 240, 252 Pac. 201 (1927). These cases are instructive on the application of the reasonableness standard. See *Rush Presbyterian St. Luke's v. Safeco Ins. Co.,* 712 F. Supp. 1344, 1345-46 (N.D. Ill. 1989).

Thus, in comparing the analogous rules of insurance law and creditor and debtor law, the insurance rule adopting the reasonableness standard should be applied to suretyship agreements.

In *City of Portland v. George D. Ward & Assoc.,* 89 Or. App. 452, 457, 750 P.2d 171, *rev. denied* 305 Or. 672 (1988), the court concluded that the surety "was bound by its implied covenant of good faith to exercise its discretion in compromising the claim so

that the reasonable expectations of all the parties would be effectuated." The *Portland* court noted:

"Parties to an indemnity agreement which subjects the right to compromise a claim against the principal to the sole discretion of the surety must reasonably expect that compromise and payment will be made only after reasonable investigation of the claims, counterclaims and defenses asserted in the underlying action. In order to prove lack of good faith in settling the claim, Management and the Wards needed only to prove that Amwest failed to make a reasonable investigation of the validity of the claims against them or to consider reasonably the viability of their counterclaims and defenses, not that Amwest acted for dishonest purposes or improper motives." 89 Or. App. at 457-58.

In *J. F. White*, 351 F.2d at 233, the court held that the bonding company's recovery should be reduced or denied to the extent that it did not exercise reasonable diligence and precaution in permitting the completion of a construction project.

In *Rush Presbyterian*, 712 F. Supp. at 1346, the court noted that Illinois "requires only a showing of negligence in actions alleging the breach of a surety's duty of good faith toward its insured, where the insured is obligated to indemnify the surety."

However, in a Vermont case, negligence on the part of the surety in paying the claim did not relieve the indemnitor of the obligation to pay. See *Wu*, 150 Vt. at 230-31 (noting that "[a]t best, the jury could draw the conclusion that plaintiff was *negligent* in analyzing Atom's bills—there was no evidence of lack of good faith for the jury" [Emphasis added.]).

In *Resolution Trust Corp. v. Continental Cas. Co.*, 799 F. Supp. 77, 82 (D. Kan. 1992), the court interpreted two construction bonds and stated: "Under Kansas law, a surety bond is treated as a contract for insurance. [Citation omitted.]" This statement is overly broad and should be read within the factual context of the case. Under Kansas law, a banker's blanket bond is treated as an insurance contract rather than a suretyship. *First Hays Banshares, Inc.*, 244 Kan. at 580; *Docking*, 122 Kan. at 240.

In the first appeal of this case, this court held that "Hartford *did* have a duty to act in good faith." This court held that "the reasonableness of the payments made by Hartford is a fact question that must be litigated." This court instructed:

"Good faith/reasonableness as to the bond in the amount of $6,500, for example, should be factually evaluated in terms of the costs of appealing and litigating before Customs.

"In litigating the good faith/reasonableness issue, factual factors to be considered include the thoroughness of the investigation performed by the surety, the cooperation or lack thereof by Tanner, and the like. See Hinchey, *Surety's Performance Over Protest of Principal: Considerations and Risks*, 22 Tort & Ins. L.J. 133, 149 (1986).

"Reversed and remanded for a factual determination of the extent of Tanner's liability, if any, under the surety agreement. Hartford can recover only those reasonable payments made in good faith."

On remand, the district court held: "The mandate from the Court of Appeals requires that defendant Tanner only has a duty to pay those amounts paid by Hartford in good faith and which were paid reasonably under the circumstances."

"In dealing with good faith arguments against lenders by borrowers, we have stated the test of good faith is subjective and requires only honesty in fact. [Citation omitted.]" *Daniels v. Army National Bank*, 249 Kan. 654, 658, 822 P.2d 39 (1991) (holding bank did not breach its duty of good faith and fair dealing by failing to inspect home under construction while borrowers were away).

The facts of this case present compelling reasons why a surety should be held to a standard of reasonableness. Thus, we agree with those cases that hold that the implied covenant of good faith requires a surety seeking indemnification to show that its conduct was reasonable.

It is recognized that "the surety's investigation is 'standard practice' in the industry." Trecker, Ott, and Case, *The Agreement of Indemnity—The Surety's Handling of Contract Bond Problems: Administration and Resolution of Performance Bond and Payment Bond Claims*, in The Agreement of Indemnity—Practical Applications by the Surety 7-8 (ABA 1990). Hartford did not conduct a thorough investigation. Hartford simply paid the claims and sought indemnification.

Hartford made no attempt to mitigate the claims. Equally important, Hartford made the payment of $58,365 after Tanner filed a petition of protest and Tanner's attorney had told Hodges that no action was required for at least 18 months. These payments by

Hartford had the practical effect of eliminating Tanner's ability to raise any defenses to the claims of Customs or to reopen the case. Allowing the surety's indemnification contract to be enforced, absent fraud, leaves the principal and indemnitor at the mercy of the surety's unreasonable conduct. See *City of Portland*, 89 Or. App. at 457-58.

### Substantial Competent Evidence

Hartford questions whether the district court's findings of facts "are supported by substantial competent evidence and whether they are sufficient to support the trial court's conclusions of law." *Levier*, 19 Kan. App. 2d at 979.

"Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]" *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377, 855 P.2d 929 (1993).

The district court found that Hartford did not act reasonably in paying the full amount demanded by Customs on the bonds. It is clear that this finding is supported by substantial competent evidence. Specifically, an attorney familiar with the relevant practices of Customs testified that Hartford did not act reasonably in paying either claim. This was considered in conjunction with the fact that when Hartford filed a protest petition on the $27,000 bond, it was required to pay nothing.

Under the reasonableness standard applied by the district court, Hartford clearly cannot recover the entire amount paid. Hartford, on appeal, argues that it should be able to recover at least an amount that is reasonable.

Tanner's witness, Susan Kohn Ross, testified that the range of mitigation for the claim of Customs against Hartford would have been 10 to 25 percent. Hartford reasons that even if it had conducted itself in accordance with the reasonableness standard, it would still have been required to pay 10 to 25 percent of the original assessment—between $6,487.65 and $16,219.13. Hartford thus argues that the district court's finding that none of the amount

paid by Hartford to Customs was reasonable is not supported by the record.

Arguing that the district court's verdict is supported by competent evidence, Tanner points to the events surrounding the claim of Customs against a third bond for $27,000. On this bond, Hartford protested, delayed payment, and the statute of limitations expired, resulting in a complete release of liability. Tanner reasons that "if Hartford had only repeated this course of conduct with the other two virtually identical bonds, they would have been completely released from liability."

The district court stated: "The Court further finds Mr. Hodges had a conversation with Customs regarding a third bond for $27,000 and sent a letter petitioning for release from Hartford's bond due to the fact the converter's records had been seized. This was not done in this case and could have been."

The record thus contains evidence that the claims herein could similarly have been mitigated to nothing. Hartford argues that Tanner's contention that Customs would have allowed the statute of limitations to expire is pure speculation. Hartford argues that the $27,000 bond was unique and that the statute of limitations had not expired on the other two bonds. Hartford's payment of the claims, however, eliminated any chance that the statute of limitations might expire on the other bonds.

The district court did not make the specific finding that if Hartford had acted reasonably, the Customs claim would have been mitigated to nothing. Tanner argues that this is a reasonable inference that may be drawn from the evidence. Tanner also argues that because Hartford did not object to the district court's findings, "this Court cannot deem the findings below to be reversible error."

"A litigant must object to inadequate findings of fact and conclusions of law in order to give the trial court an opportunity to correct them. In the absence of an objection, omissions in findings will not be considered on appeal. Where there has been no such objection, the trial court is presumed to have found all facts necessary to support the judgment. [Citation omitted.]" *Galindo v. City of Coffeyville*, 256 Kan. 455, 467, 885 P.2d 1246 (1994).

The district court found that Hartford's actions were unreasonable and allowed it nothing on the payment of the bonds. It further

assessed costs to Hartford. The question is whether allowing nothing to Hartford on the bonds was supported by substantial competent evidence. See *Tucker*, 253 Kan. at 378 (holding that the district court's failure to set out the mathematical procedure used to arrive at its decision was not reversible error because the appellant failed to object to the findings at the district court level).

Evidence of the potential disposition of the two claims, had they been handled through a protest petition, is speculative. As such, it is impossible to determine what amounts might have been assessed as damages because the estimates range from zero to the full amount paid. See *Tucker*, 253 Kan. at 377. It appears that the district court chose to believe that the assessment would have been zero.

This court ruled in the first appeal: "Hartford can recover only those reasonable payments made in good faith." Because Hartford offered no evidence on the amount that would have been assessed had the claims been protested, investigated, and negotiated, the court was left with no basis for a decision other than denying the claim in its entirety. It was Hartford's responsibility to present such evidence.

Because the district court found that the payments were not made in good faith and Hartford presented no evidence on the amount that would have been paid had they acted reasonably and in good faith, nothing is recoverable by Hartford.

Affirmed.